In re Robert Chad CHORNEY,
Debtors.

Douglas J. Lustig, as Trustee,
Plaintiffs,

v.

Peachtree Settlement Funding, LLC,
and CNA Structured Settlement,
Inc., Defendants.

Bankruptcy No. 00–23177.
Adversary No. 01–2122.

United States Bankruptcy Court,
W.D. New York.

May 2, 2002.

478

Warren B. Rosenbaum, Shapiro, Rosenbaum, Liebschutz & Nelson, LLP, Rochester, NY, for Plaintiff.

Craig M. Lessner, Settlement Funding, Inc., Norcross, GA, for Defendant.

Stephen R. Harris, Drinker, Biddle & Reath, LLP, Philadelphia, PA, for Defendant CNA.

## DECISION & ORDER

JOHN C. NINFO, II, Chief Judge.

### BACKGROUND

On October 26, 2000, Robert Chad Chorney (the "Debtor") filed a petition initiating a Chapter 7 case. On the Schedules and Statements required to be filed by Section 521 and Rule 1007, the Debtor indicated that he: (1) was the recipient of a structured settlement payable by CNA Insurance, which he valued at $59,000.00 and in which he claimed a $7,500.00 exemption; (2) had creditors holding unsecured claims in the total amount of $94,849.80, including: (a) a $50,000.00 claim held by Peachtree Settlement Funding, the consideration for which he described as a "November 1, 1999 Sale of Structured Settlement"; and (b) an approximately $21,000.00 nondischargeable student loan claim held by Sallie Mae; and (3) was employed at Eastman Kodak Company as a chemist technician at an annual salary of approximately $33,000.00.

On January 2, 2001, the Debtor amended his Schedules and Statements, including Schedule D, Creditors Holding Secured Claims, to add the claims of: (1) Peachtree Settlement Funding; and (2) a $60,000.00 claim for WebBank ("WebBank"), the consideration for which he described as a "November 1, 1999 Assignment of Structured Settlement."

On January 4, 2001, Settlement Funding, LLC, d/b/a Peachtree Settlement Funding ("Settlement Funding"), as Seller/Servicer for Peachtree Finance Company, LLC ("Peachtree Finance"), filed an "Objection" to the Debtor's claim of an exemption in his structured settlement. The Objection alleged that: (1) on April 25, 1990, the Debtor settled a personal injury claim by entering into a settlement agreement (the "Settlement Agreement") with Home Mutual Insurance Company ("Home Mutual") that provided for him to receive lump sum payments of: (a) $10,000.00 on November 18, 1996; (b) $20,000.00 on November 18, 2001; (c) $30,000.00 on November 18, 2006; and (d) $40,000.00 on November 18, 2011 (the "Structured Settlement Payments"); (2) Home Mutual assigned its payment obligation under the Settlement Agreement to

CNA Structured Settlements, Inc. ("CNA"), which purchased an annuity (the "Continental Annuity") from Continental Assurance Company ("Continental") to fund its payment obligation; (3) in November 1999, the Debtor obtained a $12,861.60 loan from WebBank (the "WebBank Loan"), in connection with which he executed: (a) a secured promissory note (the "Secured Note"); (b) a security agreement (the "Security Agreement"), pursuant to which he granted WebBank, and its successors and assigns, a security interest in certain collateral, including his rights to receive the Structured Settlement Payments; and (c) UCC–1 Financing Statements (the "Financing Statements"), which described the collateral in the same way as was set forth in the Security Agreement; (4) WebBank assigned all of its right, title and interest in the WebBank Loan and related documents, including the Secured Note, the Security Agreement and the Financing Statements, to Peachtree Finance, which contracted with Settlement Funding to service the assigned WebBank Loan; and (5) the Objection had been filed to insure that the Debtor's claim of a $7,500.00 exemption in the Structured Settlement Payments was subordinate to the interests of Peachtree Finance in the Payments.

On July 27, 2001, the Debtor's Trustee, Douglas J. Lustig, Esq., (the "Trustee") commenced an adversary proceeding against Peachtree Finance and CNA (the "Adversary Proceeding"), which requested: (1) a determination by the Court of the interest, if any, that Peachtree Finance had in the Structured Settlement Payments; and (2) in the event that the Court found that the bankruptcy estate had a superior interest in the Payments, a Court Order directing CNA to make future payments to the Trustee.

The Complaint in the Adversary Proceeding alleged that: (1) in consideration of the WebBank Loan, the Debtor had sold or assigned $13,365.00 of each of the November 18, 2001 and November 18, 2006 Structured Settlement Payments to WebBank; (2) because the contract for the Continental Annuity (the "Annuity Contract") contained provisions prohibiting the transfer, sale or encumbrance of the payments to be made, the attempt by the Debtor to transfer, sell or encumber all or any portion of the Structured Settlement Payments was void and of no effect and Peachtree Finance held no perfected lien or other interest in the Structured Settlement Payments; (3) CNA had not consented to the sale or assignment of all or any portion of the Structured Settlement Payments; and (4) the right to receive the Structured Settlement Payments was property of the bankruptcy estate.[1]

On September 10, 2001, Settlement Funding interposed an Answer to the Complaint on behalf of Peachtree Finance, which alleged that: (1) by reason of the Secured Note, Security Agreement and Financing Statements, which had been properly filed with the Monroe County Clerk's Office and the New York Secretary of State, Peachtree Finance held a perfected security interest in various contract rights of the Debtor, including the Debtor's right to receive the Structured Settlement Payments, rights that were general intangibles as defined under the New York Uniform Commercial Code (the "Former Article 9") Section 9–106;[2] (2) pursuant to Former

---

**1.** Although CNA was the payee under the Annuity Contract, for its convenience, it had directed Continental to make the Annuity payments to the Debtor. These Payments were identical in amount to the Structured Settlement Payments due from CNA to the Debtor.

**2.** Exhibit A to the Answer included copies of the Security Agreement and Financing State-

Article 9 Section 9–104(g) [3], although the Former Article 9 did not apply to the transfer of any interest or claim in or under a contract for an annuity, it did apply to the proceeds of an annuity and the perfection of an interest in the proceeds of an annuity; and (3) Former Article 9 Section 9–318(4) [4] made ineffective any provision in the Settlement Agreement or the Continental Annuity which prohibited the granting of a security interest in the right to receive the Structured Settlement Payments, which was a general intangible for money due or to become due.

On November 5, 2001, CNA filed an Answer and Cross–Claim which alleged that: (1) the Court should enter an Order declaring null and void the alleged secured claim of Peachtree Finance in the Structured Settlement Payments and declare the Payments to be unencumbered property of the Debtor's estate; (2) the Court should enter an Order directing CNA to make all of the unpaid Structured Settlement Payments directly to the Trustee; (3) the Settlement Agreement provided that the Structured Settlement Payments were not subject to assignment, transfer, commutation or encumbrance, and the qualified assignment between Home Mutual and Continental, which was authorized to be entered into by the Settlement Agreement, also provided that the Settlement Payments could not be accelerated, deferred, increased or decreased and could not be anticipated, sold, assigned or encumbered; (5) the Debtor was the payee on the Continental Annuity [5]; (6) the Annuity Contract provided that: (a) the payments could not be accelerated, increased, decreased, commuted or encumbered; (b) there could be no change in the payee;

---

ments which described the collateral as follows:

> The Collateral shall consist of all right, title and interest of Borrower (and, upon Borrower's death, of Borrower's estate and any beneficiary designated by Borrower) in, to and under any and all contract rights, or personal property whether tangible or intangible, now existing or hereinafter acquired including, without limitation, any rights to cash payments due to Borrower and all right, title and interest of Borrower, Borrower's estate or any beneficiary thereunder to receive any monies under or pursuant to or on account of or related to any and all contract rights or other personal property, whether tangible or intangible, any monies actually received by Borrower, and any interest on the proceeds of all of the above composing or comprising all or any portion of any and all contract rights or other personal property, whether tangible or intangible, and all of Borrower's present or future right, title and interest to sell, assign, transfer, cause an early termination of, settle, receive consideration for, or undertake any similar activity with respect to any of the above.

**3.** Former Article 9 Section 9–104. Transactions Excluded from Article.

> (g) to a transfer of an interest or claim in or under any policy of insurance or contract of an annuity including a variable annuity, except as provided with respect to proceeds (Section 9–306) and priorities in proceeds (Section 9–312)[.]

CLS Uniform Commercial Code § 9–104(g) (2001).

**4.** Former Article 9 Section 9–318(4) states that:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.
> Former Article 9 Section 9–105(1) states that:
> (a) "Account Debtor" means the person who is obligated on an account, chattel paper or general intangible.

CLS Uniform Commercial Code §§ 9–318(4) and 9–105(1)(a) (2001).

**5.** In fact, CNA is the payee under the Annuity Contract.

and (c) the ownership rights were not transferable; (7) because the provisions of the Settlement Agreement and related contracts prevented the assignment of the payments due under the Continental Annuity, the Debtor's attempt to assign them by executing a Security Agreement was invalid; (8) any attempt to assign the Structured Settlement Payments was void under the Restatement (Second) of Contracts, Section 3.7(2)(a), because an assignment would materially increase CNA's tax risks, administrative burdens and costs; and (9) the Former Article 9 did not apply to the transactions in question.

On November 13, 2001, the Trustee filed a Motion for Summary Judgment, which included a Memorandum of Law, (the "Trustee's Motion for Summary Judgment") which alleged that: (1) the underlying transaction between the Debtor and WebBank was an unperfected assignment by the Debtor of his right to receive payments from the Continental Annuity; (2) in 1983 the United States Congress had enacted the Periodic Payment Settlement Act ("PPSA"), which established more favorable tax treatments for structured settlements than lump sum settlements, to implement its policy objective of protecting and providing for the long term financial needs of injured persons; (3) in connection with the WebBank Loan, the Debtor paid a $2,143.60 broker's fee to Settlement Funding; (4) the interest rate on the WebBank Loan was 20.1% per annum; (5) the Debtor was prohibited under the Settlement Agreement from assigning, transferring, commuting or encumbering the Structured Settlement Payments, and CNA never consented to the Debtor transferring, assigning or encumbering all or any portion of the Payments; (6) because:

(a) Former Article 9 Section 9–104(g) made the statute inapplicable to a transfer of an interest or claim in or under any policy of insurance or contract for an annuity; and (b) the Structured Settlement Payments represented an interest in or claim under the Continental Annuity, Former Article 9 Section 9–318(4) was not applicable to make the anti-encumbrance and assignment provisions of the Settlement Agreement or the Annuity Contract ineffective, so the Debtor could not grant WebBank a security interest in the Structured Settlement Payments or assign the Payments to it; (7) because the Debtor was not a party to the Annuity Contract, Continental was not an account debtor under Former Article 9 Section 9–318(4), so that Section could not make the anti-encumbrance and assignment provisions of the Annuity Contract ineffective and the Debtor could not grant WebBank a security interest in the payments due under the Annuity Contract or assign them to it; (8) because Former Article 9 does not apply to the Debtor's rights in the Structured Settlement Payments, which are a claim to or an interest under the Continental Annuity, the assignment of or granting of a security interest to WebBank in connection with the WebBank Loan could not be perfected by the filing of the Financing Statements, it could only be perfected by notification to and acknowledgment by the issuer of the Continental Annuity, and there had been no such notification to or acknowledgment by either CNA or Continental prior to the filing of the Debtor's petition; and (9) because the assignment of the Structured Settlement Payments to WebBank or the granting of a security interest in them to WebBank were unperfected, pursuant to Section 544(a)[6], any

---

**6.** Section 544(a) provides that:
(a) The trustee shall have, as of the commencement of the case, and without regard

to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor

purported assignment or security interest in the Structured Settlement Payments could be avoided by the Trustee.

On January 11, 2002, Settlement Funding, on behalf of Peachtree Finance, filed a Motion for Summary Judgment, which included a Memorandum of Law, (the "Peachtree Motion for Summary Judgment"), which alleged that: (1) in both form and substance the transaction between the Debtor and WebBank was a WebBank Loan transaction in connection with which the Debtor had granted WebBank a security interest in both tangible and intangible contract rights, including his rights in the Structured Settlement Payments, and it was not, as characterized by the Trustee, a sale or assignment of the payments due under the Continental Annuity; (2) it was clear from the provisions of the documents executed in connection with the WebBank Loan, that WebBank and the Debtor intended for WebBank to be granted a security interest in the Structured Settlement Payments, which are general intangibles; (3) Former Article 9 Section 9–318(4) makes ineffective the anti-encumbrance provisions in the Settlement Agreement; (4) because the Structured Settlement Payments are not claims arising out of a tort or an interest in or

claim under a policy of insurance or an annuity contract, the provisions of Former Article 9 Section 9–104, which exclude those transactions from coverage under the Former Article 9, are not applicable; (5) the identical issues presented to this Court were recently decided in favor of Peachtree Finance by the Superior Court of Fulton County, Georgia, and the Third Judicial District Court of Summit County, Utah[7]; (6) even though the Debtor executed a Power of Attorney in favor of Settlement Funding and a Notice of Direction of Payments to Continental, so that any payments made under the Continental Annuity or by CNA would first be paid to Settlement Funding, the underlying transaction between the Debtor and WebBank was a secured loan transaction, not an assignment as characterized by the Trustee[8]; (7) under New York Law, even if the underlying transaction were determined by the Court to be a pledge or assignment that was not covered by the Former Article 9, because the Settlement Agreement did not specifically provide that any attempted pledge or assignment would be void, invalid or ineffective, the Debtor's pledge or assignment of the Structured Settlement Payments would be effective;

or any obligation incurred by the debtor that is voidable by—
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists[.]
11 U.S.C. § 544(a) (2002).

7. Copies of these Decisions were attached to the Affidavit of Stephen A. Kirkwood (the "Kirkwood Affidavit"), an associate counsel for Settlement Funding, submitted in support of the Peachtree Motion for Summary Judgment.

8. CNA instructed Continental to make the payments due under the Annuity directly to the Debtor. Apparently for administrative convenience, CNA was the payee on the Annuity, even though the Debtor was used as the annuitant for purposes of computing the actuarial aspects of the Annuity, however, there was no contractual agreement between CNA and the Debtor that the payments under the Annuity, which the Debtor was not a party to, would be paid directly to the Debtor.

(8) the WebBank Loan transaction, entered into between the Debtor and Web-Bank in connection with which the Debtor granted WebBank a security interest in the Structured Settlement Payments, would not have any negative tax consequences for CNA; and (9) because two of the cases attached to the Kirkwood Affidavit involved both CNA and Settlement Funding and applied New York Law, CNA was collaterally estopped from relitigating those same issues in this Court, and the Cross–Claim by CNA should be dismissed.

On January 14, 2002, CNA filed a Motion for Summary Judgment, which included a Memorandum of Law, in support of its Cross–Claim (the "CNA Motion for Summary Judgment"), which alleged that: (1) the WebBank Loan transaction violated the anti-assignment language contained in the Settlement Agreement and related contracts; (2) the transaction imposed tax risks and administrative burdens on CNA that were not bargained for at the time the Settlement Agreement and related contracts were entered into between the Debtor and CNA or its predecessors; (3) the Debtor had no power to assign the payments under the Continental Annuity, since he was not the owner of the Continental Annuity; (4) Revised Article 9 of the Uniform Commercial Code ("Revised Article 9"), which took effect in New York State on July 1, 2001, a date prior to the commencement of the Adversary Proceeding, was applicable in determining the rights of the competing parties in the Structured Settlement Payments; (5) Section 9–406 of Revised Article 9 which: (a) replaced Former Article 9 Section 9–318(4) relied on by Peachtree Finance; (b) contained a provision that might otherwise render the anti-assignment or encumbrance provisions of the Settlement Agreement ineffective, did not apply to a claim or right to receive compensation for injuries or sickness as described in Section 104(a)(1) and (2) of the Internal Revenue Code; and (c) the Settlement Agreement specifically provided that the Structured Settlement Payments constituted damages on account of personal injury or sickness as defined in Section 104(a)(2) of the Internal Revenue Code; (6) the transaction between the Debtor and WebBank was not a secured loan transaction but was an outright sale by the Debtor of his interest in a portion of the Structured Settlement Payments, because the Debtor gave up all of his rights, interests and control in and to that portion of the Payments sold; and (7) finding that Peachtree Finance held a perfected security interest in the Structured Settlement Payments would be against public policy.

On January 18, 2002, the Trustee filed an additional Memorandum of Law in support of his Motion for Summary Judgment which asserted that: (1) Former Article 9, including Section 9–318(4), did not apply to any attempt to obtain a security interest in the Structured Settlement Payments because: (a) the Payments were funded by the Continental Annuity; and (b) under Former Article 9 Section 9–104(g), the Former Article 9 did not apply to an interest in or claim under a policy of insurance or contract for an annuity; and (2) Former Article 9, including Former Article 9 Section 9–318(4), did not apply to any attempt to obtain a security interest in the Structured Settlement Payments because, pursuant to Former Article 9 Section 9–104(k), the Former Article 9 did not apply to a transfer in whole or in part of any claim arising out of a tort, and the Structured Settlement Payments were the result of the Debtor's personal injury tort claim.

On February 1, 2002, Settlement Funding, on behalf of Peachtree Finance, submitted an additional Memorandum of Law (the "Peachtree February Memorandum")

which asserted that: (1) Former Article 9, not the Revised Article 9, applied in this Adversary Proceeding, because: (a) the Debtor's bankruptcy petition was filed and his case commenced prior to the effective date of Revised Article 9 in New York State; and (b) Peachtree obtained and perfected its security interest prior to the effective date of Revised Article 9; (2) the Victims of Terrorism Relief Act of 2001, H.R. 2884, signed into law on January 23, 2002 (the "Terrorism Relief Act"), amended the Internal Revenue Code to make it clear that CNA did not and would not suffer any adverse tax consequences as a result of the WebBank Loan Transaction; (3) the fact that in the WebBank Loan documents the Debtor was afforded the ability to prepay the WebBank Loan, which would result in any future Structured Settlement Payments being free and clear of any security interest in favor of Peachtree Finance, further demonstrated that the transaction was a loan transaction; (4) the perfected security interest that Peachtree Finance held in the Structured Settlement Payments related to the contract rights of the Debtor under the Settlement Agreement, not to any rights under the Continental Annuity or the Annuity Contract because the Debtor had no ownership or other direct interest in the Continental Annuity; and (5) any increased administrative burden on CNA to make payments to creditors who might have a perfected security interest in the Structured Settlement Payments was de minimis, especially when weighed against the underlying policy of the Former Article 9 to permit security interests so that borrowers can obtain financing.

On February 4, 2002, CNA filed an additional Memorandum of Law (the "CNA February Memorandum") which asserted that even if the Court were to allow Peachtree Finance to amend its Answer to assert a collateral estoppel defense, because the parties in this Adversary Proceeding, which included the Debtor and the Trustee, were not identical to the parties in the cases attached to the Kirkwood Affidavit, the collateral estoppel doctrine did not apply.

### DISCUSSION

### I. *Summary Judgment*

Under Federal Rule of Civil Procedure 56(c), judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Rule is clear in "provid[ing] that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Repp v. Webber*, 132 F.3d 882 (2nd Cir.1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted)).

Further, as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2nd Cir.1988) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citations omitted)). However, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Repp*, 132 F.3d at 889 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted)).[9]

The duty of a court on a motion for summary judgment is to determine whether there are any genuine issues of material fact to be resolved by trial, and not to decide factual issues. As the Second Circuit has aptly stated: "In this regard, the Court's task is issue identification, not issue resolution. In performing this task, we must assume the truth of the non-movant's evidence." *Repp*, 132 F.3d at 890. *See also Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The moving party, however, does not bear the burden of proving that his opponent's case is "wholly frivolous." *Brady*, 863 F.2d at 210. *See also Celotex*, 477 U.S. at 323–26, 106 S.Ct. 2548. The Second Circuit in *Brady* further stated that: "In *Celotex*, the Supreme Court made it clear that in cases where the non-movant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if you can point to an absence of evidence to support an essential element of the non-moving party's claim." *Brady*, 863 F.2d at 210–11.

In this Adversary Proceeding, all of the parties have made motions for Summary Judgment, in essence conceding that there are no disputed material issues of fact.

## II. *Summary of Decision*

■ Peachtree Finance has a perfected security interest in the Structured Settlement Payments as security for the amounts due it under the WebBank Loan for the following reasons: (1) the Former Article 9 in effect on October 26, 2000, the date of the filing of the Debtor's petition,

not Revised Article 9, applies in this case; (2) the Structured Settlement Payments due from CNA to the Debtor are a general intangible; (3) Former Article 9 Section 9–318(4) invalidates the anti-encumbrance provisions of the Settlement Agreement, so that the Debtor's grant of a security interest in the Structured Settlement Payments to secure the amounts due on the Secured Note as part of the WebBank Loan was permissible under the Former Article 9; (4) the Debtor has no ownership interest in the Continental Annuity or rights to the payments due under the Continental Annuity, except for the fact that CNA, for its convenience, elected to have Continental make the payments due under the Continental Annuity directly to the Debtor, an election that CNA can terminate at any time; (5) Former Article 9 Section 9–104(g) is not applicable because the Structured Settlement Payments are not an interest or claim in or under a policy of insurance or under an annuity; (6) the Continental Annuity in this case was a funding mechanism that CNA chose to enable it to meet its payment obligation under the Settlement Agreement, and it is that payment obligation and payment stream, which is a general intangible in which WebBank took a security interest; (7) Former Article 9 Section 9–104(k) is not applicable because the Debtor's personal injury tort claim was eliminated and replaced by the Settlement Agreement and CNA's contractual obligation to make the Structured Settlement Payments, and that contractual obligation is not a claim arising out of a tort; (8) there are no increased tax risks or sufficient additional administrative burdens or costs for CNA as a result of the Debtor's permissible grant of a security interest in the Structured Set-

---

9. This Court is mindful that factual materiality is governed by reference to the applicable

substantive law. *Repp*, 132 F.3d at 890.

tlement Payments that would warrant the Court invalidating the security interest; (9) prior to the filing of the Debtor's Chapter 7 case neither the United States Congress nor the New York State Legislature had enacted legislation that prohibited a recipient of a structured settlement from granting a security interest in the general intangible structured settlement payments where the Debtor was not the owner and payee of an annuity that was the sole source of payment of the structured settlement payments, so that for the Court to find that Peachtree Finance has a perfected security interest in the Structured Settlement Payments is not contrary to such a law and is not, in this Court's view, against public policy; (10) although the issues presented to this Court may have been decided in favor of Peachtree Finance by other State Courts and Federal Courts not in this Federal Circuit, neither the Debtor nor the Trustee were parties to those actions, so the doctrine of collateral estoppel does not apply, and those decisions are not binding precedent for this Court.

### III. *The Applicable Article 9*

■ I find that Revised Article 9 does not apply in this Adversary Proceeding because: (1) the Debtor's bankruptcy case was filed on October 26, 2000, prior to the effective date of Revised Article 9; and (2) the priority of the claims of Peachtree Finance and the Trustee to the Structured Settlement Payments was established pri-

or to the effective date of Revised Article 9.

Section 9–702 [10] of Revised Article 9, which took effect on July 1, 2001 in New York State, provides that Revised Article 9 does not affect an action, case or proceeding commenced before the Revised Article took effect.

In addition, Section 9–709 [11] of Revised Article 9 makes Former Article 9 applicable when the priority of conflicting claims to collateral was established before Revised Article 9 took effect.

Under Section 544 it was "as of the commencement of the case" that the Trustee's rights as a "perfect lien creditor" came into existence and the relative rights and priorities of Peachtree Finance and the Trustee in and to the Structured Settlement Payments became fixed, even though they had not been finally determined by the Court.

The Trustee has asserted avoidance rights under Section 544 and he has alleged that the lien of Peachtree Finance in the Structured Settlement Payments was unperfected at the time of the commencement of the case, because the filing of the Financing Statements was ineffective to perfect the Peachtree lien. These relative rights in the Structured Settlement Payments were established at the commencement of the bankruptcy case and before Revised Article 9 took effect.

---

10. Revised Article 9 Section 9–702(c) provides that:

    Pre-effective-date proceedings. Revised Article 9 does not affect an action, case, or proceeding commenced before Revised Article 9 takes effect.

    New York Uniform Commercial Code § 9–702(c) (2002).

11. Revised Article 9 Section 9–709(a) provides that:

    Law governing priority. Revised Article 9 determines the priority of conflicting claims to collateral. However, if the relative priorities of the claims were established before Revised Article 9 takes effect, Former Article 9 determines priority.

    New York Uniform Commercial Code § 9–709(a) (2002).

**IV.** *Was the Security Interest of Peachtree Finance in the Structured Settlement Payments not Properly Perfected by the Filing of Financing Statements Because the Taking of such an Interest is Excluded from Coverage under the Former Article 9 by Either Section 9–104(g) or Section 9–104(k)?*

### A. UCC Section 9–104(g)

Section 9–104(g) of the Former Article 9 provides that the Former Article 9 does not apply "to a transfer of an interest or a claim in or under any policy of insurance or contract for an annuity."

In this case, the Debtor has never had a contractual interest in the Continental Annuity. Although in some structured settlements that are funded by an annuity, the recipient of the structured settlement may be the owner or the payee of the funding annuity, in the Debtor's case, CNA is both the owner and the payee of the Continental Annuity. The only connections that the Debtor has to the Continental Annuity are that: (1) he was used as the annuitant by Continental for actuarial purposes; and (2) solely for its convenience, CNA directed Continental to make all the payments directly to the Debtor. Because CNA can at any time change or redirect the payments in its sole discretion, the Debtor does not have any direct claim to the payments due under the Continental Annuity.

The Debtor's interest in the Structured Settlement Payments, which is property of the bankruptcy estate, is a contractual right to have CNA pay the Structured Settlement Payments. It was that contractual right to payment, which is a general intangible under Former Article 9, in which the Debtor granted WebBank a security interest when he executed and delivered the Security Agreement. Therefore, the granting of a security interest in the Debtor's contractual right to receive the Structured Settlement Payments from CNA was not a transfer of an interest or claim in or under an annuity, specifically the Continental Annuity, in which the Debtor had no interest.

### B. Section 9–104(k)

Section 9–104(k) of the Former Article 9 provides that the Former Article 9 does not apply to "the transfer in whole or in part of any claim arising out of a tort."

██ Although there is some disagreement on this issue,[12] I find that the better view is that once the Debtor entered into the Settlement Agreement his personal injury tort claim, for purposes of Former Article 9 Section 9–104(k), was extinguished and it was replaced by the contractual obligation of Home Mutual, and later CNA, to make the Structured Settlement Payments. The Debtor voluntarily substituted the contractual obligation of Home Mutual to pay the Structured Settlement Payments for his tort claim, and that substituted contractual obligation is not a claim arising out of a tort. If CNA

---

**12.** *See King David McLeroy and Settlement Funding, L.L.C. v. Hartford Life Ins. Co. and Hartford Fire Ins. Co.,* No.1999 CV 03831 (Ga.Super.Ct.2000) slip op. at 5; *In re Terry,* 245 B.R. 422, 427 (Bankr.N.D.Ga.2000); *First England Funding, LLC v. Hartford Life Ins. Co.,* No. BER–L–5609–99 (Sup.Ct.N.J. 1999), slip op. at 3; *JUA Funding Corp. v. CNA Ins./Continental Casualty Co.,* No. HUD–L–10824–97 (Sup.Ct.N.J.1998), slip op. at 3; *Settlement Capital Corp. v. Texas Farm Bureau Ins. Co. et al.* (Tex. Dist. Ct. of Dallas Cty. 1999). *But see In re Monroe County,* 29 B.R. 686 (Bankr.S.D.Fla.1983); *Interdevco, Inc. v. Hollywood Federal Savings & Loan Assoc.,* 523 So.2d 773 (Fla.Dist.Ct.App.1988); Weinberg, *Tort Claims as Intangible Property: An Exploration from an Assignees's Perspective,* 64 Kentucky L.J. 49, 87 (1976–76); *Commercial Union Ins. Co. v. Brunk,* No. 9819–98 (N.Y.Sup.Ct.1999); *Scott v. Campbell,* No. 27309/98 (N.Y.Sup.Ct.1999).

were to default on its payment obligation, the Debtor would have only a contractual claim against CNA. He would have no claim in tort against either CNA or the original tortfeasor.

Furthermore, in this case, it was only after: (1) the Settlement Agreement was executed; (2) the Debtor's tort claim was extinguished; and (3) the Debtor had a contractual right to the Structured Settlement Payments, that the Debtor executed the Security Agreement. Therefore, there was no transfer of an interest in a claim arising out of a tort.

In support of its argument for this finding by the Court, Peachtree Finance at Footnote 3 on Page 12 of the Peachtree February Memorandum pointed out that:

> Although Revised Article 9 ('RA9') is not applicable to this case, the official comments to RA9 are instructive. Official Comment 15 to 9–109 clarifies and states existing law by including in the comment the following statement: 'Note that once a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort.' *See* Official Comment to Former UCC § 9–109. Furthermore, CNA asserts that under New York Revised Article 9 (effective July 1, 2001), § 9–406(h) specifically excludes the Former UCC from covering the granting of a security interest in structured settlements. This leaves an obvious question for this Court. If, as CNA and the Trustee argue, Former UCC

§§ 9–104(g) and (k) already exclude structured settlement payments from the Former UCC's coverage, why was the specific exclusionary language necessary for structured settlements in RA9?

## V. UCC Section 9–318(4)

█ As set forth earlier in this Decision & Order, Section 9–318(4) of the Former Article 9 makes ineffective any provision in a contract between an account debtor and the account payee that prohibits the account payee from granting a security interest in that general intangible right to payment. In this case, based upon all of the facts, circumstances and evidence presented, I find that by executing and delivering the Security Agreement, the Debtor intended to and did in fact grant WebBank a security interest in the Debtor's right to receive the Structured Settlement Payments, a right and asset which is a general intangible under the Former Article 9.[13]

From the structure of the WebBank Loan, the language of the Security Agreement and the filing of the Financing Statements, it is clear that it was WebBank's intention to take a security interest in the Structured Settlement Payments, rather than to purchase or take an assignment of all or a portion of the Payments.

The Debtor signed the Security Agreement, which clearly evidenced an intention to create a security interest, and signed the Financing Statements, which further evidenced an intention that WebBank be granted a security interest. There is no

---

13. Former Article 9 Section 9–106 states that: "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance. "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instru-

ments, investment property, and money. All rights to payment earned or unearned under a charter or other contract involving the use or hire of a vessel and all rights incident to the charter or contract are accounts.
New York Uniform Commercial Code § 9–106 (2001).

credible evidence before this Court that the Debtor had an intention other than to comply with the requirements of WebBank in order to obtain the WebBank Loan proceeds. Although the Debtor's schedules and his alleged testimony at the Section 341 Meeting of Creditors may indicate that he may not have fully understood the technicalities of the WebBank Loan transaction, they do not demonstrate that he did not intend to enter into the secured transaction evidenced by the clear language of the Security Agreement.

It is undisputed that the Settlement Agreement contains language prohibiting the Debtor from granting a security interest in the Structured Settlement Payments. However, that is exactly what Section 9–318(4) of the Former Article 9 makes ineffective.

Because I find that Section 9–318(4) of the Former Article 9 makes ineffective the provisions of the Settlement Agreement that prohibited the Debtor from granting a security interest in the Structured Settlement Payments to WebBank as part of the WebBank Loan, it is unnecessary for the Court to address the arguments of the parties regarding the enforceability of such anti-assignment provisions under New York Common Law, and whether the Debtor is bound by the terms of the Annuity contract because he is a third-party beneficiary.

## VI. *Collateral Estoppel*

■ Peachtree Finance has asserted that because in: (1) various State Courts other than in New York State; (2) one New York State Supreme Court Case; and (3) various Federal Courts not within this Federal Circuit, that the issues presented in this Adversary Proceeding have been presented by Peachtree Finance and CNA, and Peachtree Finance has prevailed, the Trustee and CNA should be collaterally estopped from relitigating those issues in this Adversary Proceeding.

The doctrine of collateral estoppel does not apply to prevent CNA from litigating the issues presented in this Adversary Proceeding because in order for the doctrine to apply the issue must be identical to the issue determined in the prior proceeding. *See 233233 Co. v. The City of New York*, 171 A.D.2d 492, 496, 567 N.Y.S.2d 411 (1st Dept.1991). Peachtree concedes in its Motion for Summary Judgment that "the Singer and Barber case [sic] were decided against CNA on *almost* identical issues and documents by Courts applying New York law" (*emphasis added*). CNA, therefore, has not been afforded a full and fair opportunity to litigate the validity of the documents and actions at issue in this case that involve this Debtor. The Trustee, who was not a party in any of the cases litigated by CNA and Peachtree Finance, also has not been afforded a full and fair opportunity to litigate the issues.

## VII. *Adverse Consequences and Increased Administrative Risks and Costs*

■ CNA has asserted that if the Court were to find that Peachtree Finance had a valid and perfected security interest in the Structured Settlement Payments, it would be exposed to potential adverse tax consequences. Even if the Terrorism Relief Act, which insures that CNA will not suffer any adverse tax consequences as a result of this Decision & Order, had not been enacted, I would have found that it was highly speculative that CNA would suffer any adverse tax consequences. The PPSA clearly encouraged the establishment of structured settlements, but it did not specifically prevent the recipient of a structured settlement from factoring the payments or granting a security interest in all or a portion of the payments. There-

fore, it is unlikely that the Internal Revenue Service would have reversed the favorable tax benefits to structured settlement payors such as CNA for the acts of recipients which were legal and beyond the control of the structured settlement payors to prevent.

CNA has further asserted that if this Court were to find that Peachtree Finance had a valid and perfected security interest in the Structured Settlement Payments, it would have substantial and unanticipated increased administrative expenses, in part because of the need to verify the correct recipient of the Structured Settlement Payments as they become due.

Any such additional costs and risks in this Court's view are de minimis, and simply a part of doing business in the commercial world of the Former Article 9. Such additional costs and risks for CNA do not warrant invalidating the valid perfected security interest of Peachtree Finance.

## VIII. *Public Policy*

■ Peachtree Finance conceded at the hearings on the Respective Summary Judgment Motions, that under Revised Article 9 it would not have been able to obtain a valid security interest in the Structured Settlement Payments because Revised Article 9 does not apply to a right to receive compensation for injuries or sickness as described in 26 U.S.C. Section 104(a)(1) and (2), and the Settlement Agreement specifically sets forth that the Payments to the Debtor are damages for such injury.

In addition, the parties have advised the Court that a number of States have enacted legislation which would allow recipients of structured settlements to obtain loans against all or a portion of the payments not yet due when the reasons for the loan and the terms of the loan are approved by a court. That seems to be an enlightened approach which would both promote the underlying policy of the PPSA, and also acknowledge that there are times when the recipients, for good reason, should have access to all or a portion of the structured settlements payments before they are otherwise due.

The PPSA never specifically prevented the recipients of structured settlements from factoring or granting a security interest in the payments, and Former Article 9 was not specific, as it could have been, in preventing the granting of such a security interest.

In this case, whether well advised or not, the Debtor obtained a loan and granted a security interest in the Structured Settlement Payments to pay off some of his personal debts. In this Court's view the transaction between the Debtor and WebBank was not against public policy.

### CONCLUSION

The Trustee's Motion for Summary Judgment and the CNA motion for Summary Judgment are denied.

The Peachtree Finance motion for Summary Judgment is granted. Peachtree Finance is found to have a perfected security interest in the Structured Settlement Payments for the amounts due on the Secured Note.

**IT IS SO ORDERED.**