[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-12336

_____

In Re: PAYROLL MANAGEMENT, INC.,

Debtor.

_____

SUNZ INSURANCE COMPANY,

Plaintiff-Appellant,

*versus*

UNITED STATES OF AMERICA INTERNAL REVENUE SER-
VICE,
PAYROLL MANAGEMENT, INC.,
FLORIDA DEPARTMENT OF REVENUE,
OKALOOSA COUNTY TAX COLLECTOR,
US CAPITAL PARTNERS INC., et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:21-cv-00600-MCR-HTC

_____

Before BRANCH and LUCK, Circuit Judges, and BERGER,[*] District Judge.

PER CURIAM:

After Payroll Management, Inc. filed a chapter 11 bankruptcy petition, it received $1,070,330.23 from British Petroleum, Inc. to compensate for economic loss caused by the Deepwater Horizon Oil Spill. Sunz Insurance Company filed an adversary complaint in Payroll's bankruptcy case, claiming a first-priority security interest in the BP money because Sunz's security interest attached and perfected before any other creditor. The Internal Revenue Service disagreed, arguing that its federal tax lien had first priority because it attached and perfected first. Sunz and the Service filed dueling cross motions for summary judgment. The bankruptcy court granted summary judgment for the Service, and the district court affirmed. After careful review, and with the benefit of oral argument, so do we.

_____

[*] Honorable Wendy Berger, United States District Judge for the Middle District of Florida, sitting by designation.

## FACTUAL BACKGROUND

*Payroll Management, Inc.*

Payroll was a staffing company in Fort Walton Beach, Florida. The company provided its employees with health benefits, covered their workers' compensation injuries, paid their salaries, withheld their federal income taxes, and was responsible for paying federal taxes on their employment. Then Payroll would temporarily lease its employees to other businesses in exchange for a management fee.

*The Deepwater Horizon Oil Spill Multidistrict Litigation*

In April 2010, BP's offshore rig, *Deepwater Horizon*, exploded while drilling for oil off Louisiana's coast in the Gulf of Mexico. Eleven people died, dozens were injured, and—for nearly three months—massive amounts of oil spilled into the Gulf. Thousands of individuals and businesses, including Payroll, sued BP, alleging the spill caused them economic losses. The thousands of economic-loss lawsuits were consolidated in a multidistrict litigation.

In May 2012, the district court overseeing the multidistrict litigation certified a class of economic-loss plaintiffs, and the counsel appointed to represent the class signed an agreement settling the thousands of economic-loss lawsuits against BP. Plaintiffs could opt out and continue litigating their economic-loss lawsuits, but those who did not were bound by the settlement agreement. The plaintiffs bound by the settlement agreement released and dismissed BP from further litigation in spill-related economic-loss lawsuits. In exchange, BP agreed to create a settlement fund in which

a neutral claims administrator would evaluate and pay valid claims based on the settlement agreement's terms.

The settlement agreement's terms created a rigorous review process. Plaintiffs seeking payment had to submit a claims form within the applicable deadline and attach organizational documents, tax returns, and monthly and annual profit and loss statements. If a plaintiff was located in an area where causation could not be presumed, it was required to prove causation. The settlement agreement laid out four ways to prove causation, and each of them required additional documentation and accounting analysis to show that the spill caused the economic harm.

Once a claim was submitted, the claims administrator would review the documents and decide if the claim was eligible for payment. Claims could be denied for various reasons, including insufficient documentation supporting the claim. But if the claim was eligible for payment, the claims administrator would calculate the amount payable by using a multi-step formula that estimated the economic harm caused by the spill. The plaintiff had the right to seek reconsideration, and both the plaintiff and BP had the right to appeal the final decision. The plaintiff was not entitled to any recovery until BP's appellate rights were exhausted. If the plaintiff agreed with the amount determined by the claims administrator or the plaintiff's appellate rights to challenge the amount were exhausted, the plaintiff was required to sign an individual release—releasing BP from any further liability related to the plaintiff's economic-loss lawsuit—before the plaintiff was eligible to receive

payment.  Payment would only be made if the plaintiff signed the individual release.

The district court overseeing the multidistrict litigation approved the settlement agreement in December 2012.  It went into effect two years later once the district court's decision was affirmed on appeal and the Supreme Court declined review.  *See In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014), *cert. denied*, 574 U.S. 1054 (2014).

### Payroll Submits a Claim to the Claims Administrator

Payroll did not opt out of the settlement agreement, forgoing its right to continue litigating its economic-loss lawsuit in the multidistrict litigation.  Instead, in 2012, it submitted the claims form and supporting documents to the claims administrator.  Because Fort Walton Beach was located in an area requiring causation evidence, Payroll was required to submit detailed records and analysis establishing that the oil spill caused the company economic harm.  Payroll initially claimed that it was owed $4,900,000 in total damages.

While waiting on the claims administrator's decision, Payroll's financial situation deteriorated.  In 2013, the company began missing federal tax payments on its employees.  And, by 2015, the company struggled to pay its employees' workers' compensation claims.

In October 2015, Payroll sought workers' compensation insurance to covers its employees.  Sunz agreed to insure Payroll, but Sunz required Payroll to enter into a security agreement, providing

Sunz a security interest in Payroll's assets.  The security agreement provided that Sunz had a security interest in "the assets of [Payroll's] business . . . includ[ing], . . . all tangible and intangible property which is or may be used in the business . . . ; existing contracts and policies; . . . and proceeds of the above."  On November 3, 2015, Sunz recorded its security agreement with Payroll in the Florida Secured Transaction Registry.

In February 2017, the claims administrator notified Payroll that it was entitled to some, but not all, of the $4,900,000 it requested for its BP claim.  So, Payroll sought reconsideration of the payment amount.  While the claims administrator reconsidered, Payroll defaulted on its obligation to pay Sunz for workers' compensation coverage.  And Payroll continued to miss more federal employment tax payments.  By March 2017, the Service filed a $23 million federal tax lien notice against Payroll with the Florida Secretary of State.

Finally, in December 2017, the claims administrator sent Payroll a determination letter stating that, upon reconsideration, Payroll was eligible for $1,070,330.23 for its BP claim.  As required by the settlement agreement, the letter explained that the payment could not be issued unless Payroll's agent executed an individual release.

But before the release was signed, in March 2018, Payroll filed a chapter 11 bankruptcy petition.  On its bankruptcy schedules, Payroll listed its BP claim as an asset with an "unknown" value.

Five months later, Payroll's agent agreed to settle its economic-loss claim for $1,070,330.23 and moved for the settlement's approval in the bankruptcy court. The bankruptcy court approved the settlement, Payroll's agent signed the individual release, and the claims administrator sent the $1,070,330.23 payment to the bankruptcy court's registry where it has been held ever since.

## PROCEDURAL HISTORY

### *Adversary Bankruptcy Proceeding*

In Payroll's chapter 11 case, Sunz filed an adversary complaint against several of Payroll's other creditors, alleging that Sunz held a perfected first-priority security interest in the $1,070,330.23 payment from the claims administrator. Sunz sought a declaratory judgment that it held first priority over the payment and a court order directing that the payment be turned over to Sunz.

Sunz then moved for summary judgment, arguing that its security agreement covered Payroll's contracts, including the proceeds from those contracts. Payroll's BP claim, Sunz contended, was a contract by the time Sunz's security agreement was signed in October 2015 because Payroll had already submitted its claim to the claims administrator in 2012 and the settlement agreement had already become effective in 2014. Thus, Sunz asserted that it was entitled to the money because its security interest attached to the contract and perfected before any other creditor.

The Service disagreed and filed a cross motion for summary judgment, arguing that Payroll's BP claim was a commercial tort claim, not a contract, when the federal tax lien notice was filed in

March 2017. While Sunz's security interest did not attach to Payroll's commercial tort claim, the Service asserted that its tax lien attached automatically to the commercial tort claim and perfected once it filed the federal tax lien notice. Thus, the Service contended that it was entitled to the money because its tax lien attached and perfected first.

The bankruptcy court granted summary judgment for the Service. The bankruptcy court explained that a commercial tort claim does not convert into a contract until the tort claim has settled and there is a contractual obligation to pay. The bankruptcy court agreed with the Service that Payroll's BP claim was a commercial tort claim when the federal tax lien notice was filed because, at that time, BP did not have a contractual obligation to pay.

The bankruptcy court further explained that under federal law the Service's federal tax lien attached to Payroll's commercial tort claim when the Service assessed Payroll's unpaid taxes, and the tax lien perfected once the Service filed the federal tax lien notice. Under Florida law, Sunz's security agreement did not attach to Payroll's BP claim because the security agreement did not adequately describe commercial tort claims as collateral. Because the Service's tax lien attached to Payroll's BP claim and perfected in March 2017 (when Payroll's BP claim was still a commercial tort claim), the bankruptcy court concluded that the Service's tax lien took priority over Sunz's security interest, and the Service was entitled to judgment as a matter of law.

*Appeal to the District Court*

Sunz appealed to the district court, arguing that the bankruptcy court erred in concluding that Payroll's BP claim was still a commercial tort claim in March 2017 because the settlement agreement converted Payroll's BP claim into a contract well before that time. And because the October 2015 security agreement between Sunz and Payroll described Payroll's contracts as collateral, Sunz had an attached and perfected security interest before the Service's tax lien perfected in March 2017.

The district court affirmed the bankruptcy court's judgment, explaining that the settlement agreement created an out-of-court process to administer Payroll's BP claim more quickly but did not automatically create a contractual obligation to pay Payroll's BP claim. The district court agreed with the bankruptcy court that Payroll's BP claim was a commercial tort claim, rather than a contract, in March 2017 when the Service filed its tax lien notice. Because Sunz did not have a security interest in Payroll's commercial tort claims, the district court also agreed with the bankruptcy court that the Service's tax lien perfected first and, therefore, held first priority over the payment.

Sunz appeals the district court's order affirming the summary judgment for the Service.

## STANDARD OF REVIEW

In an appeal of a district court's order affirming a bankruptcy court's grant of summary judgment, we review the bankruptcy court's judgment de novo, applying the "well-known

summary judgment standards." *In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.'" *In re NRP Lease Holdings, LLC*, 50 F.4th 979, 982 (11th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).

## DISCUSSION

We begin by discussing the legal framework for resolving the priority dispute between Sunz and the Service. Applying this framework, we briefly consider the undisputed points that narrow the issue to whether Payroll's BP claim was a commercial tort claim in March 2017. If it was, then the Service's tax lien takes first priority because it perfected in March 2017 and Sunz did not have a security interest in commercial tort claims. But if Payroll's BP claim was a contract in March 2017, then Sunz's security interest takes priority because it perfected in November 2015, well before the Service's tax lien perfected, and Sunz had a security interest in Payroll's contracts and the proceeds of the company's contracts. Finally, we explain why Payroll's BP claim was a commercial tort claim in March 2017.

*The Federal and State Legal Framework for Priority Disputes*

Determining the priority of Sunz's and the Service's competing interests in the proceeds of Payroll's BP claim implicates both federal and state law. Based on the choice of law clause in the security agreement between Sunz and Payroll, Florida law governs Sunz's interest, while federal law governs the Service's federal tax

lien and provides the priority rule. *See Atl. States Constr., Inc. v. Hand, Arendall, Bedsole, Greaves & Johnston*, 892 F.2d 1530, 1534 (11th Cir. 1990) ("Since a federal tax lien is wholly a creature of federal law, the consequences of a lien that attaches to property interests, e.g., priority determinations, are matters of federal law.").

Under Florida's Uniform Commercial Code, a creditor's security interest attaches to the debtor's collateral when the debtor signs "a security agreement that provides a description of the collateral." Fla. Stat. § 679.2031(2)(c). A general description of the type of collateral is sufficient in most cases. *See id.* §§ 679.1021(pp), 679.1081(1). But for commercial tort claims, a creditor's security interest will not attach unless the security agreement explicitly describes the commercial tort claim. *See id.* § 679.1081(5)(a). Commercial tort claims include tort claims brought by a business for economic damages. *Id.* § 679.1021(m). Once attached, the creditor can perfect its security interest by filing a financing statement in the Florida Secured Transaction Registry. *Id.* § 679.5011.

Federal law does not require the Service to have a security agreement for its tax lien to attach to a debtor's assets. *See* 26 U.S.C. § 6321. Instead, the Service's interest attaches to all of the debtor's assets, including commercial tort claims, once the taxes are assessed. *See id.*; *see also United States v. Hubbell*, 323 F.2d 197, 200 (5th Cir. 1963) (concluding federal tax liens attach to "unliquidated claim[s] sounding in tort"). The Service's tax lien perfects once it files a federal tax lien notice with the appropriate state registry. *See* 26 U.S.C. § 6323(a), (f)(1)(ii). And under the federal priority dispute

rules, the Service's tax lien takes priority if it perfected first. *See United States v. McDermott*, 507 U.S. 447, 449 (1993) (citing 26 U.S.C. § 6323(a)).

*Issues the Parties Do Not Dispute*

With this framework in mind, three undisputed points narrow the issue over who has first priority over the proceeds of Payroll's BP claim. First, Payroll's BP claim started as a commercial tort claim under Florida law because Payroll was a business suing BP in tort for purely economic damages. *See* Fla. Stat. § 679.1021(m). Second, Sunz did not have a security interest in Payroll's commercial tort claims because its security agreement did not describe commercial tort claims as collateral, much less specifically describe them. *See id.* § 679.1081(5)(a). And third, because Payroll refused to pay its assessed federal employment taxes and the Service filed its federal tax lien notice in March 2017, the Service's federal tax lien attached to all of Payroll's property, including its commercial tort claims, and perfected at that time. *See* 26 U.S.C. §§ 6321, 6323(f)(1)(ii); *Hubbell*, 323 F.2d at 200.

Based on those points, the case boils down to whether Payroll's BP claim was a commercial tort claim under Florida law in March 2017. If it was, the Service's tax lien takes priority because it perfected in March 2017 and Sunz did not have a security interest in Payroll's commercial tort claims. *See McDermott*, 507 U.S. at 449. If Payroll's BP claim was a contract by March 2017, then Sunz's security interest takes priority because it attached to the contract in October 2015 when Payroll signed the security agreement and

perfected when Sunz filed a financing statement in November 2015—well before the Service's tax lien perfected—as Sunz had a security interest in Payroll's contracts and their proceeds.  *See* Fla. Stat. §§ 679.2031(2)(c), 679.5011.

*Payroll's BP Claim Was a Commercial Tort Claim in March 2017*

Sunz argues that Payroll's BP claim was not a commercial tort claim in March 2017.  Instead, as it did in the bankruptcy court and district court, Sunz contends that Payroll's BP claim converted into a contract before Payroll and Sunz entered into the security agreement in October 2015 because Payroll already submitted its claims form and supporting documentation to the claims administrator in 2012 and the settlement agreement became effective in 2014.  Like the other courts to hear this argument, we disagree.

A commercial tort claim converts into a contract when the claim has been (1) "settled" and (2) "reduced to a contractual obligation to pay."  Fla. Stat. Ann. § 679.1091 cmt.15 (West 2024).  Here, Payroll's BP claim was not "reduced to a contractual obligation to pay" Payroll before the Service filed its federal tax lien notice in March 2017.  *See id.*  The settlement agreement did not give Payroll an automatic right to payment.  Instead, the staffing company had a right to have its BP claim administered more quickly in the claims review process.  A contractual obligation to pay did not arise until that claims review process ended with a signed individual release that stated the amount to be paid.  And in March 2017, Payroll hadn't yet reached the end of the claims review process.

By that time, Payroll had already submitted its claims form and supporting documents to the claims administrator, alleging that the oil spill caused economic damages. And the claims administrator had already determined that Payroll's BP claim was payable but submitted a settlement offer less than Payroll's claimed amount. Payroll rejected the offer and sought reconsideration of the payment amount, and the claims administrator's reconsideration decision was still pending in March 2017. So at that time, the claims review process was not finished because Payroll and the claims administrator had not agreed on a certain payment amount, BP had not exhausted its right to appeal, and Payroll had not signed an individual release. Thus, BP had no "contractual obligation to pay" Payroll in March 2017, and Payroll's BP claim was still a commercial tort claim at that time. *See* Fla. Stat. Ann. § 679.1091 cmt.15 (West 2024).

Sunz offers three counterarguments for why Payroll's BP claim was a contract, rather than a commercial tort claim, by March 2017. First, Sunz argues that the settlement agreement's release provision automatically extinguished Payroll's commercial tort claim, settling the claim and reducing it to a contractual obligation to pay. In Sunz's view, the "individual release was redundant and would not have prevented" Payroll "from receiving payment because as a party to the [s]ettlement [a]greement," Payroll "had already released all claims against" BP.

But Sunz misreads the settlement agreement. The release provision did not automatically extinguish Payroll's commercial

tort claim because that provision did not automatically obligate BP to pay Payroll a certain amount. *See* Fla. Stat. Ann. § 679.1091 cmt.15 (West 2024). Instead, the obligation to pay only arose after Payroll's BP claim reached the end of the review process, and Payroll signed the individual release which—unlike the release provision in the settlement agreement—stated that BP was obligated to pay a certain amount and Payroll was not entitled to any further payment for its claim. Thus, as the settlement agreement makes clear, the individual release was not redundant but was explicitly "a precondition to receiving any settlement payment on a claim."

Second, Sunz argues that Payroll's commercial tort claim automatically extinguished when the claims form and supporting documents were submitted because the settlement agreement provided an objective formula to pay plaintiffs. In other words, the settlement agreement's formulaic payment system automatically reduced the commercial tort claim into a contractual obligation for BP to pay Payroll a certain amount.

But this ignores the other hurdles to receiving a payment and the complicated nature of the formula for calculating the payment. To trigger payment to Payroll, the claims form had to be timely submitted, the documents had to be the correct ones, causation had to be proven, the claims administrator had to determine formally the claim was payable, BP's appellate rights had to be exhausted, and Payroll had to sign an individual release.

Even disregarding those hurdles to payment, the settlement agreement's multi-step formula involved a complicated accounting

analysis that estimated the economic loss caused by the spill but did not always create certain outcomes. Take this case for example. Payroll initially claimed $4.9 million in total damages, the claims administrator provided an initial payment amount that Payroll disagreed with, Payroll filed for bankruptcy protection and listed its BP claim as having an unknown value, and the parties ended up settling Payroll's BP claim while Payroll was in bankruptcy for $1,070,330.23 upon the claims administrator's reconsideration. Simply submitting claim documents alone did not automatically entitle Payroll to be paid a certain amount.

Last, Sunz cites *In re Chorney*, 277 B.R. 477 (Bankr. W.D. N.Y. 2002) in support of its position that the settlement agreement automatically extinguished Payroll's commercial tort claim and converted it into a contract. But this case is materially distinguishable from *Chorney*. There, the debtor settled a personal injury claim through a traditional structured settlement, automatically entitling the debtor to four certain lump-sum payments over ten years. *Id.* at 478. Because the structured settlement automatically created a "contractual right to payment," the bankruptcy court concluded that the "debtor's tort claim was extinguished." *See id.* at 487–88. Here, the settlement agreement is fundamentally different than the structured settlement in *Chorney* because the settlement agreement in this case only entitled Payroll to have its claim administered more quickly in a claims review process and did not automatically entitle Payroll to be paid a certain amount. Because the settlement agreement did not create an automatic obligation to pay Payroll, Payroll's BP claim remained a commercial tort claim, not a

contract, even after the settlement agreement was signed. *See* Fla. Stat. Ann. § 679.1091 cmt.15 (West 2024).

## CONCLUSION

The Service's federal tax lien attached to all of Payroll's assets, including commercial tort claims, when Payroll's federal employment taxes were assessed and perfected when the Service filed a federal tax lien notice in March 2017. *See* 26 U.S.C. §§ 6321, 6323(f)(1)(ii); *Hubbell*, 323 F.2d at 200. At that time, Payroll's BP claim was still a commercial tort claim. Because Sunz and Payroll's security agreement did not describe commercial tort claims as collateral, Sunz's security interest had not attached to Payroll's BP claim when the Service's tax lien perfected. *See* Fla. Stat. § 679.1081(5)(a). So, as both the bankruptcy court and district court concluded, the Service's tax lien takes priority in the $1,070,330.23 payment because the Service's tax lien perfected first. *See McDermott*, 507 U.S. at 449.

**AFFIRMED.**