In re Tom D. JOHNSON, Debtor.

No. 94–48884.

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Oct. 14, 2010.

Robert N. Bassel, Clinton, MI, Sandra A. Hazlett, Hazlett & Associates, P.C., Ann Arbor, MI, for Debtor.

## AMENDED OPINION * REGARDING DEBTOR'S MOTION FOR DAMAGES FOR COMERICA BANK'S ALLEGED VIOLATIONS OF THE DISCHARGE INJUNCTION

THOMAS J. TUCKER, Bankruptcy Judge.

The Debtor in this Chapter 7 case, Tom D. Johnson, obtained a discharge in 1997. Several years later, he filed a motion seeking more than $3 million in damages for alleged violations of the discharge injunction by a creditor, Comerica Bank ("Comerica").[1] The Motion is based on Comerica's alleged attempt to enforce a security interest that Comerica claims to have in Debtor's right to receive disability benefits under his employer's long term disability plan.

The Court construes the Motion as seeking damages for civil contempt, based on a claim that Comerica violated the discharge injunction imposed by 11 U.S.C. § 524(a)(2). In this opinion, after resolv-

---

* This amended opinion amends, in several minor ways, the opinion that was filed on October 11, 2010.

1. "Debtor's Verified Motion For Damages From Creditor For Violation of Stays and Other Relief" (Docket # 639, the "Motion").

ing several legal issues in Comerica's favor, the Court concludes that Comerica has an enforceable security interest in Debtor's right to receive disability benefits, which survived Debtor's bankruptcy discharge. As a result, Comerica's alleged attempt to enforce its security interest did not violate the discharge injunction, and Plaintiff's Motion must be denied.

## I. Jurisdiction

 This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 157 and 1334, and District Court Local Rule 83.50(a) (E.D.Mich.). This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(O). This proceeding is also "core" because a contempt proceeding based on a violation of the § 524(a)(2) discharge injunction is an action "created or determined by a statutory provision of title 11." *See generally Allard v. Coenen (In re Trans–Industries, Inc.)*, 419 B.R. 21, 27 (Bankr.E.D.Mich.2009).

## II. Procedural History and Factual Background[2]

### A. Debtor's right to receive disability payments

For some 20 years before he filed this bankruptcy case in 1994, Debtor was employed as a sales representative for The Equitable Life Assurance Society of the United States ("The Equitable").[3] As a benefit of Debtor's employment with The Equitable, he participated in a long term disability plan entitled "The Equitable Life

Assurance Society of the United States Employees, Managers and Agents Long Term Disability Plan" (the "Plan" or the "Equitable Plan").[4] Article I of the Plan provides:

> The [Plan] provides disability benefits for eligible employees, managers and agents by replacing wages lost by reason of absence from work or inability to perform required duties because of personal injury or illness resulting in total disability.[5]

Article IX, § 9.2 of the Plan (the "Spendthrift Clause") provides:

> 9.2 *Spendthrift Clause*—**To the extent permitted by law,** Members are prohibited from anticipating, **encumbering,** alienating or **assigning** any of their rights, claims or interest in this Trust or in any of the assets thereof, and no undertaking or attempt to do so shall in any way bind the plan Administrator or the Trustee or **be of any force or effect whatsoever.** Furthermore, **to the extent permitted by law, no such rights, claims or interest of a Member in this Trust or in any of the assets thereof shall in any way be subject to such Member's debts, contracts or engagements, nor to attachment, garnishment, levy or other legal or equitable process.**[6]

The Plan contains a choice of law provision in Article IX, § 9.6 entitled "Construction of the Plan," which provides:

> This Plan shall be construed according to the laws of the State of New York,

---

**2.** Some of the background facts contained in this opinion are taken from the opinion of the United States Court of Appeals for the Sixth Circuit, in an earlier appeal in this case. *Comerica Bank v. Johnson (In re Johnson )*, 166 F.3d 1214, 1998 WL 833774 (6th Cir. 1998) (unpublished table decision).

**3.** Docket # 662, Exhibit 1.

**4.** Exhibit 5 to Docket # 198 is a copy of the Plan.

**5.** Plan (Docket 5 # 198, Ex. 5) at 1 ("Foreward").

**6.** *Id.* at 35–36 (emphasis added).

and all provisions hereof shall be administered according to, and its validity and enforceability shall be determined under the laws of such state, except where preempted by ERISA.[7]

In early 1991, Debtor was found to be disabled, and he began receiving disability benefits under the Plan. He continues to receive disability benefits.[8]

### B. Comerica's security interest

In addition to working for The Equitable, Debtor was engaged in the commercial real estate development business. As the Sixth Circuit noted in an earlier appeal in this case,

> In connection with that endeavor, Debtor signed as a comaker, and also guaranteed the repayment of, a note to Comerica (the "Comerica Note") from Greenwood Centre, Inc. ("Greenwood"), a corporation wholly owned by the Debtor. The Comerica Note is secured by a mortgage on commercial real estate owned by Greenwood as well as a security interest granted [to Comerica] by the Debtor, individually, in his accounts receivable, general intangibles and contract rights.

*Comerica Bank v. Johnson (In re Johnson)*, 166 F.3d 1214, 1998 WL 833774, *1 (6th Cir.1998) (unpublished table decision).

Comerica's security interest in Debtor's accounts receivable, general intangibles and contract rights was created by a security agreement that Debtor signed on July 31, 1985. That agreement granted Comerica a "continuing security interest" in, among other things, all of Debtor's "Accounts Receivable."[9] The Security Agreement defines "Accounts Receivable" to "mean[ ] and include[ ] all accounts and general intangibles including, but not limited to ... insurance proceeds, [and] beneficial interests in trusts[.]"[10] It does not define the terms used in this definition, including the terms "accounts" and "general intangibles." Section 5.1 under the "Miscellaneous" provisions, provides that the Security Agreement "shall in all respects be governed by and construed in accordance with the laws of the State of Michigan."[11]

### C. Debtor's default and bankruptcy

Debtor's company, Greenwood, defaulted under the Comerica Note, and Comerica began collection efforts against Greenwood and Debtor. In February 1994, Comerica sued Debtor, The Equitable, and other entities in the Jackson County, Michigan, Circuit Court, seeking to enforce its security interest.

On September 1, 1994, Debtor filed this bankruptcy case under Chapter 11. At that time, Debtor owed Comerica over $1 million.[12] Debtor's Chapter 11 case was converted to Chapter 7 on December 31,

---

7. *Id.* at 39.

8. *See* Docket # 76.

9. Docket # 735, Ex. A, at 1 (first unnumbered paragraph).

10. *Id* at 1 § 1.1.

11. *Id.* at 3 § 5.1.

12. *See* Comerica's Proof of Claim (Claim # 5); Tr. of hearing on "Motion to Modify Stay by Comerica Bank Objection to Proof of Claim of Comerica Bank Presentment of Or-

der for Fourth Amended Disclosure Statement" (Docket # 252) at 30–34; Memorandum Op. filed May 29, 1996 (Docket # 271) at 3 ("The sworn testimony establishes that at the time the bankruptcy was commenced, the Debtor was indebted to Comerica in the amount of one million ninety eight thousand four hundred thirty eight and 58/100 ($1,098,438.58) dollars.") After the Debtor's bankruptcy petition was filed, "Comerica advanced additional sums totaling one hundred thirty six thousand two hundred forty four and 51/100 dollars ($136,244.51) dollars in order to pay current real estate taxes out-

1994.[13] On May 29, 1996, after holding an evidentiary hearing, Bankruptcy Judge Graves[14] made rulings on a number of issues, including certain issues related to Comerica's security interest.[15] Among other things, the Court held that Comerica had a valid security interest in the Debtor's general intangibles, contract rights and accounts receivable.[16] This was based on the Court's findings that the parties made a written security agreement; that Comerica perfected its security interest by filing the necessary documents with the Michigan Secretary of State; and that the Security Agreement was never terminated.[17] The Court also held that Debtor's disability benefits under the Plan were exempt under Michigan law.[18]

Judge Graves's rulings, which involved a number of matters in addition to the Debtor's disability benefits, were affirmed on appeal by the district court, except as to the disability benefits. As to those, the district court concluded that "the bankruptcy court did not determine whether the disability payments are subject to a security interest of Comerica, and, if so, whether the Debtor has waived his right to claim an exemption for such benefits under Michigan law."[19] In an order dated May 30, 1997, the district court remanded these issues to the bankruptcy court for determination.[20]

Next, on October 8, 1997, the Debtor received a discharge.[21] Then, in response to the district court's May 30, 1997 remand order, Comerica filed a motion in the bankruptcy court seeking a determination of the remand issues in its favor, on November 25, 1997.[22] Comerica's motion requested, in relevant part, that the Court "[e]nter an Order finding that [T]he Equitable disability payments being received by Debtor are subject to Comerica's security interest; that such disability payments are not exempt under Michigan or Federal law, and directing that [The] Equitable pay such benefits directly to Comerica until its secured claim is paid in full[.]"[23] Judge Graves held a hearing on September 29, 1998, during which he directed the parties to file proposed findings of fact and conclusions of law.[24] The parties did so, and Debtor later filed a supplemental brief on the issues remanded.[25] But Judge Graves took no further action, and never

standing and owing against its real estate collateral." (Memorandum Op. filed May 29, 1996 (Docket # 271) at 3.)

**13.** Docket # 327.

**14.** This case was originally assigned to Judge Ray Reynolds Graves, now retired. When the case was reopened, as described below, it was assigned to the undersigned judge, as Judge Graves's successor.

**15.** Docket # 421 (Amended Memorandum Opinion dated June 23, 1997, by Judge Graves) (amending the Court's Memorandum Opinion dated May 29, 1996 (Docket # 271)).

**16.** *Id.* at 21.

**17.** *Id.* at 5–8.

**18.** *Id.* at 17–18, 22.

**19.** *See* Docket # 407 (May 30, 1997 Order of District Judge Julian Abele Cook, Jr., affirming the bankruptcy court's final order of May 26, 1996) at 7.

**20.** *See id.* at 9.

**21.** Docket # 451.

**22.** Docket # 458 (Comerica's "Motion on Remand to Determine Extent of Comerica's Secured Claim").

**23.** *Id.* at 3.

**24.** Docket # 568 (Comerica's "Objection and Answer to Verified Objection to and Motion to Strike Comerica's Findings of Fact, Conclusions of Law and Judgment") at 1 ¶ 1.

**25.** *See* Docket # 553 (Comerica's proposed findings of fact and conclusions of law);

made a decision on the two issues remanded.

Eventually, the Chapter 7 trustee filed a final report, and the bankruptcy case was closed on May 23, 2001.[26] For the next six years, neither Comerica nor Debtor took any action to reopen the case or to have the bankruptcy court decide the remanded issues.

## D. State court litigation between Debtor and Comerica after the bankruptcy case closed

After the bankruptcy case was closed, Debtor and Comerica engaged in litigation in the Jackson County, Michigan, Circuit Court. In connection with that litigation, on March 29, 2006, Scott S. Brinkmeyer, new counsel for Comerica,[27] sent a letter to Peter A. Teholiz, an attorney who had formerly represented AXA Equitable, LLC and its predecessor, The Equitable.[28] The letter is described in some detail here, because Debtor claims that Comerica's sending this letter violated the discharge injunction.

The letter summarized Mr. Brinkmeyer's understanding of the history of litigation between Comerica, The Equitable, and Debtor. The letter erroneously assumed that the remanded issues had been decided by Judge Graves, in Comerica's favor.[29] The letter requested that Mr. Teholiz forward the letter to The Equitable in order to explore a possible resolution.[30] The letter stated, in part:

> Insofar as disability benefits, service fees and the applicable interest rate issues are concerned, my reading of the decisions by Judge Graves and the Jackson County Circuit Court suggests that those issues have been decided in favor of Comerica Bank. I have nothing to indicate that there was any further appeal of those decisions which yielded a different result, but I stand to be corrected if you have contrary information. I appreciate that you have indicated that The Equitable has been accumulating the service fees, presumably with interest, and has not made any payments to

Docket # 560 (Debtor's proposed findings of fact and conclusions of law); Docket # 579.

26. This case remained closed from May 23, 2001 until it was reopened, on Debtor's motion, on October 30, 2007 (Docket # 650). In the meantime, the undersigned judge had been appointed as a bankruptcy judge for this district on March 21, 2003, succeeding Judge Graves.

27. Mr. Brinkmeyer replaced Comerica's former counsel, Vern J. Steffel, Jr.

28. *See* Affidavit of Peter A. Teholiz, Esq. ("Teholiz Aff.") (Docket # 691) at ¶¶ 1–2. Mr. Teholiz states in his affidavit that he "had represented The Equitable in Comerica's complaint and judgment against The Equitable and [Debtor] in the Jackson County Circuit Court, in subsequent appeals, and in settlement negotiations with Comerica's former counsel," but at the time of Brinkmeyer's March 29, 2006 letter, Teholiz had not represented The Equitable for several years. (Teholiz Aff. at ¶ 3.) A copy of Brinkmeyer's

March 29, 2006 letter is attached to the Teholiz Affidavit as Exhibit A. Attached to Brinkmeyer's letter as exhibits were a number of court orders and opinions from the United States District Court, the United States Bankruptcy Court, and the Jackson County, Michigan, Circuit Court (Docket # 691, Exs. 1–7).

29. According to Mr. Brinkmeyer, when he wrote the March 29, 2006 letter, he believed (erroneously) that Judge Graves had signed and entered, as the Court's decision, certain *proposed* findings of fact and conclusions of law filed by Debtor, at Docket # 553, after the September 29, 1998 hearing referred to in Part II–C of this opinion. *See* Affidavit of Scott S. Brinkmeyer (Docket # 690) at ¶ 7. But that is not correct. The document at Docket # 553 was filed by Debtor, but was never signed or adopted by Judge Graves.

30. *See* Teholiz Aff. (Docket # 691) at ¶¶ 2–3; Ex. A of Teholiz Aff.

Mr. Johnson. I do not know, however, for what period of time those accrued fees are applicable, nor am I aware of the rate of interest at which the fees have been accumulated.

**It is my expectation, however, that the same cannot be said for the § 501(c)(9) disability benefits. I would like to think that théy, like-wise, have been retained and would certainly like to know the status of those payments. The documents I have retrieved from Mr. Steffel's file reflect his calculations of those ac-crued amounts to be substantial. As a consequence, it would appear that there is a judgment in place in favor of Comerica Bank and against The Equitable pertaining to those disabili-ty payments and the service fees, which needs to be resolved.** If you disagree, please provide copies of any documentation which you suggest con-tradicts this conclusion.[31]

The letter implied that further litigation was imminent if the parties could not ami-cably resolve the issues between Comerica and The Equitable, including the issue of Comerica's right to receive Debtor's dis-ability payments. In this regard, the let-ter stated:

I would hope to save the time and ex-pense of having to reopen [either the bankruptcy case or the Jackson County Circuit Court case or both cases] in or-der to resolve these issues, but far too much time has passed for my client to wait too much longer. Consequently, I encourage you to pass this information along to The Equitable as quickly as possible and reply to this letter at your earliest opportunity so that we may ex-plore the possibilities of prompt resolu-tion.[32]

Teholiz forwarded the letter to The Eq-uitable.[33] Teholiz states in his affidavit that he does not "recall Mr. Brinkmeyer ever asking [him] to advise or demand that . . . [The] Equitable withhold disability payments to [Debtor]."[34] But the Court finds that such a demand was implied by the language in Brinkmeyer's March 29, 2006 letter, quoted in bold above. In any case, after receiving the letter, The Equi-table withheld disability payments from the Debtor for the months of September and October 2006. This led to further litigation in the Jackson County Circuit Court, which, in turn, caused The Equita-ble to resume the monthly disability pay-ments to Debtor.[35] The Equitable also paid Debtor the monthly payments it had withheld.

### E. Reopening of the bankruptcy case and Debtor's Motion

On May 23, 2007, and without first mov-ing to reopen this case, Debtor filed the

---

**31.** Ex. A to Teholiz Aff. (Docket # 691) at 4 (emphasis added).

**32.** *Id.* at 5.

**33.** Teholiz Aff. (Docket # 691) at ¶ 3.

**34.** *Id.* at ¶ 4.

**35.** In September and October 2006, The Equi-table also stopped making disability payments to Debtor's ex-wife, who had been awarded $5,000.00 per month of the disability benefits Debtor was entitled to, in the Judgment of Divorce. In response to The Equitable's ces-sation of payments, Debtor filed a motion to show cause in the Jackson County Circuit Court, which had entered the Judgment of Divorce. (*See* Docket # 691 at Ex. B.) On October 12, 2006, the Circuit Court entered an order requiring a representative of The Equitable to appear and show cause "why it ha[d] failed to comply with this Court's In-come Withholding Order, which The Equita-ble had "previously honored since April 1, 2003." (*See id.*) As a result of these proceed-ings in the state court, The Equitable again began making disability payments to Debtor and his ex-wife.

present Motion, asserting that Comerica violated the automatic stay and the discharge injunction, in numerous ways. The Motion requested actual and punitive damages in excess of $3 million. One of the ways in which Debtor claimed that Comerica violated the discharge injunction was by its alleged effort to enforce its security agreement against Debtor's disability benefits.[36] Debtor later moved to reopen this case, and the case was reopened "to allow the Debtor to proceed with actions against [Comerica] for violation(s) of the discharge injunction." [37]

After holding a hearing on January 9, 2008, the Court entered an order regarding further proceedings on Debtor's Motion. The order required Comerica to "file a motion for summary judgment with respect to certain of its defenses to Debtor's [M]otion." [38] Comerica then filed a motion for summary judgment.[39]

After another hearing, the Court entered an order on March 20, 2008, granting Comerica's summary judgment motion in all respects "except with respect to the allegations contained in ¶ 18 of Debtor's Damages Motion." The Court therefore denied *Debtor's* Motion in all respects, "except with respect to the allegations contained in ¶ 18 of that [M]otion." [40] The Court scheduled further briefing and a further hearing, regarding Paragraph 18 of the Motion. That paragraph alleges that "Comerica, through fraudulent and/or careless misrepresentation of the existence of a court order, caused The Equitable to

stop paying Debtor's disability income until Debtor succeeded in a separate state court action to recover the disability income." [41]

After holding another hearing, the Court granted the parties leave to conduct discovery on the unresolved portion of the Motion.[42] After holding another hearing on July 23, 2008, the Court required the parties to file certain supplements to their briefs and exhibits.[43] Next, on December 16, 2008, the Court issued an order that made the following conclusions:

A. Neither the Bankruptcy Court (in this case,) the United States District Court (in any appeal filed in this case) nor any non-bankruptcy court has made a definitive, final ruling (*i.e.*, a ruling that was not effectively vacated on appeal and remanded for further consideration,) on the question whether the Comerica Bank security interest validly covered and applied to any right of the Debtor to disability benefits, specifically the disability benefits that were the subject of the March 29, 2006 letter from Comerica's counsel to counsel for ... The Equitable.

B. In order to decide the remaining, unresolved portion of Debtor's ... Motion, which the Court has construed as a motion seeking damages for civil contempt, based on a claim that Comerica Bank violated the discharge injunction, it is necessary for the Court now to

---

**36.** Docket # 639 ("Debtor's Verified Motion For Damages From Creditor for Violation of Stays and Other Relief").

**37.** Docket # 650 ("Order Granting Debtor's Motion to Reopen Case to Proceed with Actions for Violations of the Discharge Injunction").

**38.** Docket # 659 at 1 ¶ 2.

**39.** Docket # 661.

**40.** Docket # 679 at ¶¶ 1–2.

**41.** Docket # 639 at ¶ 18.

**42.** Order, Docket # 695.

**43.** Order, Docket # 720.

decide the question identified in paragraph A above.[44]

The Court ordered the parties to file briefs on this issue. After reviewing those briefs, on February 10, 2009, the Court entered a further order, in which the Court made the following conclusions regarding the Spendthrift Clause, which is the anti-alienation provision in the Equitable Plan: [45]

[T]he Plan is a "welfare benefit plan" and a "welfare plan" as defined in ERISA, and is not a "pension plan." As a result, the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1), does not apply to this Plan. Nor does the similar anti-alienation provision in the Internal Revenue Code apply. *See* 26 U.S.C. § 401(a)(13) (applicable to a trust "forming part of a stock bonus, pension, or profit-sharing plan of the employer"). *See generally* 29 U.S.C. §§ 1002(1), 1002(2)(A); *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 836–37, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); *Metropolitan Life Insurance Co. v. Marsh*, 119 F.3d 415, 419–20 (6th Cir.1997).

As a result, the anti-alienation provisions in the Equitable Plan are rendered neither enforceable nor unenforceable by ERISA and the Internal Revenue Code. The Court must look to applicable state law to determine the validity and enforceability of the Plan's anti-alienation provisions.[46]

The Court required the parties to brief certain sub-issues, relating to the enforceability of the Plan's anti-alienation provi-

sion. (This, in turn, is relevant to the issue of whether the Comerica security interest validly covered and applied to Debtor's right to disability benefits under the Plan.) The Court explained:

It appears, based on Section 9.6 of the Equitable Plan, that the applicable state law on this question is New York law, unless the particular New York statutory or common law that would otherwise be applicable is preempted by ERISA. *See* 29 U.S.C. § 1144(a); *Mackey v. Lanier Collection Agency & Service, Inc.*, *supra* (state law that refers to, or that treats differently, ERISA covered employee benefit plans or benefits, is preempted by ERISA; generally-applicable state law that does not do so is not preempted by ERISA).

As far as the Court can determine, the parties have never briefed the question whether the anti-alienation provision is valid and enforceable under New York law, or whether any otherwise-applicable New York law on this subject is preempted by ERISA under the principles of *Mackey*. They now must do so, on the schedule stated below.

A further issue has to do with the applicability of Article 9 of the Uniform Commercial Code, adopted in both New York and Michigan, at the time of the security agreement in this case. The Debtor has argued, by citing to Debtor's earlier briefs at Docket ## 199 and 76, that U.C.C. Article 9 does not apply to any purported grant of a security interest by the Debtor in his rights to receive disability benefits under the Equitable

**44.** Docket # 734 ("Further Scheduling Order Regarding Debtor's Motion for Damages") at 1–2.

**45.** The Spendthrift Clause is quoted in Part II–A of this opinion.

**46.** Docket # 745 ("Order Requiring Further Briefing on Specific Issues Relating to Comerica Bank's Claimed Security Interest in Debtor's Right to Receive Disability Benefits From the Equitable Plan and Further Scheduling Order Regarding Debtor's Motion for Damages") at 2–3.

Plan. Debtor's argument is based on U.C.C. § 9–109(h)(former U.C.C. § 9–104(g)), adopted in Michigan at Mich[.] Comp. Laws § 440.9109(h) (former Mich[.] Comp. Laws § 440.9104(g)), which now provides that:

> (4) This article does not apply to any of the following:
>
> . . .
>
> (h) A transfer of an interest in or an assignment of a claim under a policy of insurance, other than an assignment by or to a health-care provider of a health-care-insurance receivable and any subsequent assignment of the right to payment, but sections 9315 and 9322 apply with respect to proceeds and priorities in proceeds.

[Footnote: New York has adopted this U.C.C. provision as well. *See* N.Y. Uniform Commercial Code § 9–109(d)(8)(McKinney) ].

It appears that Comerica Bank has not briefed this issue before. If Debtor is correct in his argument, it would appear that the U.C.C. provision that Comerica Bank relies on, to argue that the anti-alienation provision in the Equitable Plan is *unenforceable,* does not apply. (For its argument, Comerica Bank cites current U.C.C. § 9–406(4)) (former U.C.C. § 9–318(4), adopted in Michigan at Mich[.] Comp. Laws § 440.9406(4)) (former Mich[.] Comp. Laws § 440.9318(3)). [Footnote: New York has adopted this U.C.C. provision as well. *See* N.Y. Uniform Commercial Code § 9–406(d) (McKinney) ].

Thus, it is necessary for the parties to brief Debtor's argument that, based on the U.C.C. provision quoted above, Article 9 of the U.C.C. does not apply to any

security interest Debtor may have attempted to grant in Debtor's right to disability benefits under the Equitable Plan.

Finally, if Article 9 of the U.C.C. does *not* apply, as Debtor argues, then the issue would become whether, under any applicable *non*-U.C.C. statutory or common law, Debtor's grant of a security interest in his right to disability benefits was valid. *See, e.g., Comerica Bank-Ann Arbor, N.A. v. Sutherland (In re Duke Roofing Co.),* 47 B.R. 990, 992–93 (E.D.Mich.1985) (discussing the common law (*i.e.,* non-U.C.C. law) regarding security interests in "future intangibles," including Michigan and New York case law).[47]

The briefs and other materials filed by the parties, regarding the sub-issues identified in the Court's February 10, 2009 Order, prompted two further orders permitting further filings, entered on March 30, 2009 and October 9, 2009.[48] Finally, on February 22, 2010, the Court granted a motion filed by Debtor, to supplement the record by filing a trust agreement related to the Equitable Plan.[49]

## III. Discussion

■ Debtor's Motion alleges a violation of the discharge injunction contained in Bankruptcy Code § 524(a)(2). That section states:

> (a) A discharge in a case under this title—
>
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any [debt discharged under section 727] as a personal liability of the debtor, whether

---

**47.** *Id.* at 3–5 (italics in original).

**48.** Docket ## 754, 761.

**49.** Docket ## 769, 770.

or not discharge of such debt is waived[.]

11 U.S.C. § 524(a)(2). The Court has construed Debtor's Motion as a motion to hold Comerica in civil contempt for violating the discharge injunction. The Sixth Circuit has held that no private right of action exists under 11 U.S.C. § 524 for a violation of the discharge injunction. *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422–23 (6th Cir.2000). But a violation of the discharge injunction may warrant the imposition of compensatory sanctions for civil contempt. *In re Andrus*, 184 B.R. 311, 315 (Bankr.N.D.Ill.1995).

This opinion will address several issues, including the two issues remanded for decision by the district court in 1997, which were never decided. Those two remanded issues are "whether the [Debtor's] disability payments are subject to a security interest of Comerica, and if so, whether the Debtor has waived his right to claim an exemption for such benefits under Michigan law." [50]

 Resolution of these issues is necessary before the Court can determine whether Comerica violated the discharge injunction. If Comerica has a valid and enforceable security interest in Debtor's right to receive disability benefits, then Comerica did not violate the discharge injunction in merely seeking to enforce that security interest. This is because a Chapter 7 bankruptcy discharge does not, in and of itself, discharge a creditor's lien. And actions that merely seek to enforce a creditor's surviving lien are not considered to be actions to collect a debt "as a personal liability of the debtor" within the meaning of the § 524(a)(2) discharge injunction.

It is firmly established that a lien "rides through" bankruptcy unaffected, unless the lien is disallowed or avoided.

*Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991); *J. Catton Farms, Inc. v. First Nat'l Bank*, 779 F.2d 1242 (7th Cir.1985) (Liens pass through bankruptcy unaffected, meaning that a secured creditor may choose to ignore the bankruptcy proceeding and enforce his security interest); *Estate of Lellock v. Prudential Ins. Co.*, 811 F.2d 186 (3rd Cir.1987) (Although underlying debt was discharged in bankruptcy, the lien created before the bankruptcy against Debtor's property to secure that debt survived discharge where the lien was neither disallowed nor avoided); *Newman v. First Sec. Bank*, 887 F.2d 973 (9th Cir. 1989) (If secured creditor chose not to file a claim or otherwise assert any interest in the security during the bankruptcy proceedings, the bankruptcy discharge has no effect on the lien); *accord In re Tarnow*, 749 F.2d 464, 466 (7th Cir.1984); *In re Braun*, 152 B.R. 466 (Bankr.N.D.Ohio 1993); *In re Hunter*, 164 B.R. 738 (Bankr.W.D.Ky.1994); *In re Kuebler*, 156 B.R. 1012 (Bankr. E.D.Ark.1993).

*In re Willis*, 199 B.R. 153, 154 (Bankr. W.D.Ky.1995); *see also* the discussion and authorities in Part III–B of this opinion.

### A. Comerica's security interest covers Debtor's right to receive disability payments under the Plan.

In order to determine whether Comerica's security interest covers Debtor's right to receive disability benefits under the Equitable Plan, the Court must determine the nature of that right.

As discussed in Part II–B of this opinion, Comerica's security interest covers Debtor's accounts and general intangibles, as well as Debtor's "insurance proceeds"

---

**50.** *See* Part II–C of this opinion.

and "beneficial interests in trusts." The Security Agreement does not define any of these terms.

Debtor appears to argue that his right to receive disability benefits is either (1) a beneficial interest in a trust;[51] or (2) a right under a group insurance policy.[52] Debtor thus appears to concede that his right to disability benefits is within the scope of Comerica's security interest. Debtor argues, however, that Comerica's security interest is not enforceable, because of the Equitable Plan's Spendthrift Clause, quoted in Part II–A of this opinion.

Comerica, on the other hand, argues that Debtor's right to receive disability benefits under the Plan is either (1) a beneficial interest in a trust, or (2) a contract right, but that it is not a right in or under an insurance policy.[53] And Comerica argues that the Spendthrift Clause is not enforceable against its security interest.

Debtor further argues that Comerica's security interest is invalid under certain anti-alienation provisions of New York trust law. Comerica disputes this.

In the next three subsections of this opinion, the Court considers these arguments, and concludes that Debtor's right to receive disability payments under the Equitable Plan: (1) is a contract right, and as such is either an "account" or a "general intangible" covered by Comerica's security interest; (2) is not an interest in or under an insurance policy; and (3) is not a beneficial interest in a trust. The Court further concludes that (4) the Plan's Spendthrift Clause is not enforceable

against Comerica's security interest, under Article 9 of New York's Uniform Commercial Code; and (5) Comerica's security interest is not invalidated by New York trust law.

**1. Debtor's right to disability benefits is a contract right, because the Plan is a contract between The Equitable and the participants of the Plan, including Debtor.**

■ Comerica argues that the Plan is a contract between The Equitable and the participants of the Plan, and therefore, Debtor's right to receive disability payments under the Plan is a contract right. The Court agrees. The Plan is an employee welfare benefit plan governed by ERISA, but it is also a contract between the plan sponsor, The Equitable, and the participants of the Plan, including Debtor. Many cases recognize that such ERISA benefit plans are contracts. *See, e.g., Sprague v. General Motors Corp.*, 133 F.3d 388, 395–396, 399–400 (6th Cir.1998) (stating that the plan, under which early retirees of General Motor Corporation claimed to be entitled to health care benefits for life at no cost, was a welfare plan regulated by ERISA and that the plan was a bilateral contract between GM and "each early retiree to vest health care benefits at retirement"); *Meade v. Pension Appeals and Review Comm.*, 966 F.2d 190, 191, 195 (6th Cir.1992) (finding that "an employee benefit plan regulated by ... ERISA" is a written contract; and noting that "other courts have uniformly characterized [claims for benefits under 29 U.S.C. § ] 1132(a)(1)(B) ... as breach of contract claims for purposes of determining the

---

**51.** *See, e.g.,* Debtor's Response Br. to Court's Order Docket No. 45 (Docket # 750) at 4–5 (stating that "the plan is considered a trust that can have anti-alienation 'spendthrift' protection" and discussing case law on the assignment of a beneficial interest in a trust).

**52.** *Id.* at 2–3 (discussing case law on group insurance policies).

**53.** *See, e.g.,* Comerica's Br. in Resp. to the Court's Feb. 10, 2009 Or. (Docket # 746) at 2, 4.

most analogous statute of limitations under state law"); [54] *Kerry v. Southwire Co. & Affiliates Employee Benefit Plan,* 324 F.Supp.2d 1225, 1229 (D.Utah 2004) (" 'A plaintiff's action to enforce the medical benefits provision of a *self-funded* ERISA plan is essentially a lawsuit by an employee against her employer for breach of contract' and district courts should apply the 'statute of limitations for an action on a written contract.' ") (italics in original; citation omitted).

Therefore, Debtor's right to receive disability benefits under the Plan is a contract right. As discussed in Part III–A–2–a of this opinion, this means that it is either an "account" or a "general intangible"—one or the other—as those terms are defined by applicable law (New York's Uniform Commercial Code). As such, Debtor's right to receive disability benefits is also an "account" or a "general intangible" within the meaning of the Security Agreement, and therefore is covered by Comerica's security interest.

**2. In this case, former § 9–318(4) of the New York Uniform Commercial Code applies, and renders the Spendthrift Clause ineffective against Comerica's security interest.**

Debtor argues that the Spendthrift Clause in the Plan precludes Comerica from obtaining a security interest in Debtor's right to disability benefits. The Spendthrift Clause purports to make the Debtor's granting of such a security interest ineffective. As noted in Part II–A of this opinion, that Clause says that "[t]o **the extent permitted by law,** Members are prohibited from anticipating, **encumbering,** alienating or **assigning** any of their rights, claims or interest in this Trust or in any of the assets thereof, and no undertaking or attempt to do so shall in any way bind the plan Administrator or the Trustee or **be of any force or effect whatsoever.**" (emphasis added).

Comerica argues that former § 9–318(4) of McKinney's Uniform Commercial Code of New York ("N.Y. U.C.C.") renders *the Spendthrift Clause* ineffective. [55] Debtor, in turn, counters Comerica's argument by claiming that this statute, which is part of the New York U.C.C.'s Article 9, does not apply, because the Plan is a policy of insurance. Debtor cites the version of N.Y. U.C.C. § 9–104(g) which was in effect when the parties made the Security Agreement. That statute states, with exceptions not applicable here, that "[Article 9] does not apply ... to a transfer of an interest or claim in or under any policy of insurance[.]" [56] Comerica, in turn, disputes that its security interest is an interest "in or under any policy of insurance." Comerica

---

**54.** Section 1132(a)(1)(B), referred to in *Meade,* provides:

 (a) Persons empowered to bring a civil action. A civil action may be brought—

 (1) by a participant or beneficiary—

 . . .

 (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]

29 U.S.C. § 1132(a)(1)(B).

**55.** Comerica's Br. in Resp. to the Court's Feb. 10, 2009 Or. (Docket # 746) at 2.

**56.** The N.Y. U.C.C. was revised effective July 1, 2001, almost six years after the parties made the Security Agreement in this case. N.Y. U.C.C. § 9–109(d)(8) now contains this insurance exclusion. It is substantively the same as former N.Y. U.C.C. § 9–104(g). Current § 9–109(d)(8) states:

 (d) Inapplicability of [A]rticle [9]. This article does not apply to:

 . . .

 (8) a transfer of an interest in or an assignment of a claim under a policy of insurance[.]

argues that the Plan is not a "policy of insurance."

The Court agrees with Comerica's position, and will now discuss these competing arguments in turn.

### a. Former N.Y. U.C.C. § 9–318(4) applies to the Spendthrift Clause.

██ The former version of § 9–318(4) of N.Y. U.C.C.,[57] which was in effect when the Debtor and Comerica made the Security Agreement in this case, states:

> A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.[58]

57. New York law, rather than the law of Michigan or any other state, applies, and neither party contends otherwise. New York law applies because Article IX, § 9.6 of the Plan requires the Plan to be construed according to New York law. And both Michigan and New York courts generally give effect to choice-of-law provisions in a contract absent any strong countervailing public policy. In *Kelly Services, Inc. v. Marzullo*, 591 F.Supp.2d 924, 932 (E.D.Mich.2008), the court, relying in part on *Chrysler Corp. v. Skyline Indus. Services, Inc.*, 448 Mich. 113, 528 N.W.2d 698, 703–04 (1995) and Restatement (Second) of Conflict of Laws § 187(2) (1988), explained that under Michigan law,

 a contractual choice of law provision will be binding unless either:
 (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
 (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [§ ] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Similarly, in *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir.1987) (citations omitted), the court explained that when a choice-of-law provision exists in a contract, "and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated." *See also In re Metaldyne Corp.*, 409 B.R. 671, 676–77 (Bankr. S.D.N.Y.2009) (applying New York law to interpret a credit agreement and security agreement); *Eastern Artificial Insemination Co-op. Inc. v. La Bare*, 210 A.D.2d 609, 619 N.Y.S.2d 858, 859 (N.Y.App.Div.1994) (choice of law provisions in a contract "generally are given effect by the courts of [New York] unless the jurisdiction whose law is to be applied has no reasonable relation to the agreement at issue or enforcement of the subject provision would violate a fundamental public policy of [New York]"); *Wheat v. First Nat. City Bank*, 41 Misc.2d 723, 246 N.Y.S.2d 536, 538 (N.Y.Sup. Ct.1963) ("[e]ffect is to be given to the choice so made by the settlor of the trust" in giving effect to the choice of law provision in a trust) (citation omitted); *Reger v. Nat'l Ass'n of Bedding Mfrs. Group Ins. Trust Fund*, 83 Misc.2d 527, 372 N.Y.S.2d 97, 115–116 (N.Y.Sup.Ct. 1975) ("The rule to be applied is rather simple: in group insurance policies a choice of law provision should be given effect unless it contravenes this state's public policy[.]") (citations omitted).

The parties have not identified, and the Court is unaware of, any strong public policy reason which would require the Court to disregard the choice-of-law provision in the Plan. Nor have the parties argued that New York lacks a substantial relationship to the parties or their performance, or that there was no reasonable basis for choosing New York law. Therefore, the Court will give effect to the choice-of-law provision in the Plan, and apply New York law.

58. As noted in footnote 56, the N.Y. U.C.C. was revised, effective July 1, 2001, almost six years after the parties made the security agreement in this case, on July 31, 1985. Therefore, the former version of N.Y. U.C.C. § 9–318(4) governs. Revised N.Y. U.C.C. § 9–702(c), provides: "Pre-effective-date proceedings. Revised Article 9 does not affect an action, case, or proceeding commenced be-

This section applies to the operation of the Plan's Spendthrift Clause against Comerica's security interest, based on the way the key terms in this section are defined in the N.Y. U.C.C. As explained below, (1) The Equitable and Debtor are an "account debtor" and "an assignor," respectively; (2) the Plan is a "contract between an account debtor and an assignor," because it is a contract between The Equitable and Debtor; and (3) the Spendthrift Clause in the Plan "prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due." Thus, former § 9–318(4) applies, and renders the Plan's Spendthrift Clause ineffective as against Comerica's security interest.

■ Under former N.Y. U.C.C. § 9–105(1)(a), "'[a]ccount debtor' means the person who is obligated on an account, chattel paper, or general intangible[.]" Former N.Y. U.C.C. § 9–106, in turn, defines the words "account" and "general intangibles" as follows:

> "Account" means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.
> "General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money. . . .

Debtor's contractual right to receive disability benefits under the Plan is either an "account," or, if not an "account," necessarily is a "general intangible," under these definitions.[59] *See generally Lustig v. Peachtree Settlement Funding, LLC* (*In re Chorney*), 277 B.R. 477, 487 (Bankr. W.D.N.Y.2002) (a contractual right to payment is "a general intangible under former [U.C.C.] Article 9"). Whichever it is— account or general intangible—The Equitable is an "account debtor" within the meaning of N.Y. U.C.C. § 9–105(1)(a), because The Equitable is obligated to pay Debtor the disability payments, and as noted above, anyone who is obligated on *either* an "account" or a "general intangible" is an "account debtor" under N.Y. U.C.C. § 9–105(1)(a).

■ The word "assignor" is not defined by the N.Y. U.C.C., but a generally-accepted definition is that an "assignor" is "[a] person who assigns or transfers property to another." Black's Law Dictionary 119 (6th ed. 1990). Debtor is an "assignor" because he transferred an interest in property to Comerica, by granting Comerica a security interest in his contractual right to receive disability payments.

As already discussed, the Plan is a contract between The Equitable and Debtor, and thus, it is a contract between an "account debtor" (The Equitable) and an "assignor" (Debtor).

The Spendthrift Clause in the Plan prohibits Debtor from encumbering any of his "rights, claims or interest" in the Plan. The granting of a security interest in a contract right is an encumbering of that right. To the extent that right is an "account," the Spendthrift Clause is a term in a contract that "prohibits the assignment

---

fore Revised Article 9 takes effect." As discussed below, however, even under the post–2001 (current) version of New York's U.C.C., the result would be the same in this case.

**59.** The argument for classifying Debtor's right to disability benefits as an "account," under the above statutory definition, is that it is a

"right to payment for . . . services rendered . . . ," because Debtor's right to disability benefits is part of his compensation for the work he did for his employer, The Equitable. If Debtor's right is not an "account," however, necessarily it must be a "general intangible."

of an account." In the alternative, the Spendthrift Clause is a term in a contract that "prohibits creation of a security interest in a general intangible for money due or to become due."

For these reasons, the Spendthrift Clause is rendered ineffective by former N.Y. U.C.C. § 9–318(4), as against Comerica's security interest. And the Court notes that the Spendthrift Clause itself contemplates that the law may limit its reach in certain situations. The Spendthrift Clause explicitly limits its anti-alienation effect, "to the extent permitted by law."

The result would be the same, even if the post–2001 (current) version of New York's U.C.C. applied. Current N.Y. U.C.C. § 9–406(d)(1), which became effective July 21, 2001, provides in relevant part, with exceptions not applicable here, that

> (d) ... **a term in an agreement between an account debtor and an assignor** or in a promissory note **is ineffective to the extent that it:**
>
> (1) **prohibits, restricts,** or requires the consent of the account debtor or person obligated on the promissory note to **the assignment or transfer of, or the creation, attachment, perfection, or enforcement of a security interest in, the account,** chattel paper, **payment intangible,** or promissory note[.]

(Emphasis added). Although the wording of current N.Y. U.C.C. § 9–406(d)(1) is somewhat different from its prior version under former N.Y. U.C.C. § 9–318(4), it is substantively the same in all respects relevant here. Likewise, the current definitions of the terms "account" and "account debtor" are somewhat different from the former definitions of these terms, but the current definitions of these terms and of the term "payment intangible" yield the same result in this case as the former definitions.[60]

Thus, applicable state law renders the Plan's Spendthrift Clause ineffective against Comerica's security interest.[61]

**b. The Plan is not an insurance policy, so the insurance exception of former N.Y. U.C.C. § 9–104(g) does not exclude Comerica's security interest from U.C.C. Article 9's coverage.**

■■■ Debtor argues that U.C.C. Article 9, and therefore former N.Y. U.C.C. § 9–318(4), do not apply to Comerica's security interest, because of former N.Y. U.C.C. § 9–104(g). As noted above, that section states, with exceptions not applicable here, that "[Article 9] does not apply ... to a transfer of an interest or claim in or under any policy of insurance[.]"

---

**60.** *Compare* current N.Y. U.C.C. § 9–102(a)(2) (" 'Account' ... means a right to payment of a monetary obligation, whether or not earned by performance, ... for services rendered or to be rendered[.]") *with* former N.Y. U.C.C. § 9–106 (" 'Account' means any right to payment for ... services rendered ... whether or not it has been earned by performance."); *and* current N.Y. U.C.C. § 9–102(a)(3) (" 'Account debtor' means a person obligated on an account ... or general intangible.") *with* former N.Y. U.C.C. § 9–105(1)(a) (" 'Account debtor' means the person who is obligated on an account ... or general intangible[.]") Under current N.Y. U.C.C. § 9–102(a)(61), " 'Payment intangible' means a general intan-

gible under which the account debtor's principal obligation is a monetary obligation."

**61.** And the result would be the same if Michigan law, rather than New York law, applied. (The Security Agreement between Comerica and the Debtor states that Michigan law governs.) Mich. Comp. Laws Ann. § 440.9406(4)(a), which is currently effective, contains the same language as current N.Y. U.C.C. § 9–406, quoted above. And Michigan's version of former U.C.C. § 9–318(4) was the same as New York's version of former § 9–318(4).

Debtor argues that his right to receive disability benefits under the Plan is a right under a group insurance policy. The Court disagrees. The Uniform Commercial Code does not define the phrase "policy of insurance" or the word "insurance." But a commonly accepted definition of "[p]olicy of insurance" is as follows:

> An instrument in writing, by which one party (insurer), **in consideration of a premium,** engages to indemnify another (insured) against a contingent loss, by making him a payment in compensation, whenever the event shall happen by which the loss is to accrue. Contract whereby insurer, **in return for premiums,** engages, on happening of designated event, to pay certain sum as provided. *In re O'Neill's Estate,* 143 Misc. 69, 255 N.Y.S. 767, 771 [1932].

*Black's Law Dictionary* 1041–42 (6th ed. 1990) (emphasis added). Although the Plan is a contract between the Employer (The Equitable) and its employees, under which the employees will receive compensation in the form of disability payments upon the happening of the contingent event of their becoming disabled, the promised disability payments are not in return for the payment of premiums by employees. Rather, the Plan is funded through contributions from The Equitable, which are deposited in a Trust Fund to be used for paying benefits under the Plan.[62] In other words, the Plan is self-funded or self-insured. "Self-insurance" is not insurance—rather, it is "[t]he practice of setting aside a fund to meet losses **instead of insuring against those losses through insurance.**" Black's Law Dictionary 1220 (6th ed. 1990) (emphasis added). Because a self-insured plan is not an insurance policy, the Plan is not insurance policy.

This conclusion is reinforced by the language of the Plan itself. No provision of the Plan defines, refers to, or describes the Plan as an insurance policy. Additionally, the Plan does not use the typical words found in insurance policies such as "insurer," "insured," "policy," "premiums," "insurable interest," and "risks." *See Black's Law Dictionary* 802, 1157 (6th ed. 1990) (defining "insurance" and "policy of insurance").

The Court's conclusion is also reinforced by the definition of "employee welfare benefit plan" under § 1002(1) of ERISA. This provision includes within its definition of "employee welfare benefit plan" or "welfare plan," a plan which provides for the payment of disability benefits to plan participants "through the purchase of insurance **or otherwise[.]"** *See* 29 U.S.C. § 1002(1) (emphasis added). This language brings plans that are self-funded, as well as plans that are funded through purchasing insurance policies, within the definition of "employee welfare plan" under 29 U.S.C. § 1002(1). In both cases, § 1002(1) of ERISA draws a distinction between the plan itself and its funding mechanism. It follows from this statutory distinction that even those plans that are funded through the purchase of insurance are not themselves insurance policies.

Finally, 29 U.S.C. § 1144(b)(2)(B), often referred to as ERISA's "deemer clause," expressly states that an employee benefit plan cannot be deemed an insurance company or insurer, for purposes of state laws regulating insurance companies or contracts. This cautions against construing the Plan as an insurance policy in other contexts. Section 1144(b)(2)(B) provides:

> **(B)** Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan

---

62. *See* Plan at 22–23 ¶¶ 5.1–5.2.

established primarily for the purpose of providing death benefits), nor any trust established under such a plan, **shall be deemed to be an insurance company or other insurer,** bank, trust company, or investment company **or to be engaged in the business of insurance** or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

29 U.S.C. § 1144(b)(2)(B)(emphasis added). Cases construing this statute explain that Congress intended welfare benefits plans that are self-funded to be completely free of state laws regulating insurance companies, because such self-funded plans are not insurance companies. For example, in *Eversole v. Metropolitan Life Ins. Co., Inc.*, 500 F.Supp. 1162, 1169 (C.D.Cal. 1980), the court stated:

> The deemer clause bars a state from treating a plan as if it were an insurance company because the drafters must have assumed that if the plan were an insurance company, it would still be subject to state law due to the [insurance] savings clause [ (Section 1144(b)(2)(A) of ERISA) ].[63] The effect of the deemer clause is to prohibit a state from regulating an employee benefit plan even though the plan serves as a self-insurer on its benefits. Thus, the deemer clause distinguishes between true insurance companies, which are subject to state law, and employee benefit plans, which are exempt from state regulation even

though they exhibit some of the same risk-distributing characteristics as traditional insurance.

(citation and footnote omitted);[64] *see also FMC Corp. v. Holliday*, 498 U.S. 52, 61, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990) ("We read the deemer clause to exempt self-funded ERISA plans from state laws that 'regulat[e] insurance' within the meaning of the [insurance] saving clause."); *Thompson v. Talquin Bldg. Products Co.*, 928 F.2d 649, 652 (4th Cir.1991) (rejecting the argument that the self-funded plan was an insurance policy, even though the plan had purchased commercial insurance covering the employer in the event of employee health claims exceeding $25,000.00, and stating that "so long as the Plan can be categorized as self-funded, state law cannot regulate it").

In *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the United States Supreme Court implicitly recognized that neither self-funded welfare plans, nor welfare plans funded through the purchase of insurance, are insurance policies. The Court did so in discussing how the interaction between ERISA's "insurance saving clause" and its "deemer clause" impacts state regulation of uninsured plans, as opposed to insured plans. In *Metropolitan Life*, the Court had to decide whether a state statute that mandated that certain minimum mental-health-care benefits be included in health insurance policies, when applied to insurance policies purchased by

---

**63.** Section 1144(b)(2)(A), often referred to as the "insurance saving clause" provides: "Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b)(2)(A).

**64.** As explained by the court in *McLaughlin v. General American Life Ins. Co.*, No. Civ.A. 97–

1410, 1998 WL 24427, at \*2 (E.D.La. Jan.21, 1998), the *Eversole* decision was abrogated, on grounds other than its interpretation of the deemer clause, by a later Supreme Court case. *McLaughlin v. General American Life Ins. Co.*, No. Civ.A. 97–1410, 1998 WL 24427, at \*2 (E.D.La. Jan.21, 1998) (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 50, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987)).

employee plans regulated by ERISA, was pre-empted by ERISA. *Id.* at 728, 105 S.Ct. 2380. The Court held that the state statute "was saved from pre-emption by the operation of the [insurance] saving clause." *Id.* at 744, 105 S.Ct. 2380 (footnote omitted). In so holding, the Court recognized that "[its] decision results in a distinction between insured and uninsured plans, leaving the former open to indirect regulation while the latter are not." *Id.* at 747, 105 S.Ct. 2380. Under the Supreme Court's holding, neither type of plan can be *directly* regulated by state insurance law, because neither type of plan is an insurance policy. However, plans which purchase insurance policies to fund their benefits are subject to "indirect" regulation because the insurance policies they purchase can be regulated by state law, as allowed under § 1144(b)(2)(A) of ERISA.

For all of these reasons, the Court concludes that the Plan in this case is not a policy of insurance. Because the Plan is not an insurance policy, Debtor's transfer of his right to receive disability payments under the Plan was not a transfer of an interest or claim in or under any policy of insurance. Former N.Y. U.C.C. § 9–104(g), therefore, does not exclude Comerica's security interest from U.C.C. Article 9's coverage. Former N.Y. U.C.C. § 9–318(4), therefore, *does* apply, as Comerica claims.

**c. ERISA does not address the enforceability of the Plan's Spendthrift Clause, and ERISA does not pre-empt former N.Y. U.C.C. § 9–318(4).**

The Court previously ruled, in its February 10, 2009 Order, that the Plan's Spendthrift Clause is not covered by the anti-alienation provisions in ERISA and the Internal Revenue Code. The Court reiterates that ruling now, for the following reasons.

■ There are two broad types of employee benefit plans covered by ERISA: an "employee welfare benefit plan" and an "employee pension plan," which are also referred to in ERISA respectively as a "welfare plan" and a "pension plan." *See* 29 U.S.C. §§ 1002(1), 1002(2)(A). With certain exceptions, ERISA requires that *pension* plans prohibit the assignment or alienation of benefits. 29 U.S.C. § 1056(d)(1). However, ERISA does not impose the same requirement on the assignment or alienation of benefits under a *welfare* plan. *See generally Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988).

In the Court's February 10, 2009 Order, the Court determined that the Plan at issue in this case is an employee welfare benefit plan.[65] For this reason, the Court determined that the anti-alienation provision of the Plan is not rendered either enforceable nor unenforceable by

---

65. The phrases "employee welfare benefit plan" and "welfare plan" are defined in § 1002(1) of ERISA as:

any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1).

ERISA.[66] The Court also reached the same conclusion about the similar anti-alienation requirements of the Internal Revenue Code, contained in 26 U.S.C. § 401(a)(13). That statute requires that a qualified trust include an anti-alienation provision, but it applies only to a trust "forming part of a stock bonus, pension, or profit-sharing plan of the employer." *See* 26 U.S.C. § 401(a).

■ The Court concluded, and reiterates now, that because there is no provision of ERISA or the Internal Revenue Code that makes the anti-alienation provision of the Equitable Plan—the Spendthrift Clause—either enforceable or unenforceable, it is necessary to look to applicable state law.[67]

■ Although ERISA's anti-alienation provisions do not apply to the Equitable Plan, that Plan is covered generally by ERISA. The question arises whether former N.Y. U.C.C. § 9–318(4) is pre-empted by ERISA's pre-emption statute, 29 U.S.C. § 1144(a). The Court concludes that it is not.

ERISA's pre-emption statute states in pertinent part that:

[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

In *Mackey v. Lanier Collection Agency & Serv., Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988), the United States Supreme Court considered whether ERISA pre-empted a Georgia garnishment statute. In *Mackey,* a collection agency in

Georgia obtained judgments against participants in an employee welfare benefit plan. *Id.* To satisfy the judgments, the collection agency tried to garnish the plan participants' welfare benefits. *Id.* at 827–28, 108 S.Ct. 2182. A Georgia statute prohibited the garnishment of benefits under an employee welfare benefit plan governed by ERISA. The Georgia statute provided:

"Funds or benefits of a pension, retirement, or employee benefit plan or program subject to the provisions of the federal Employee Retirement Income Security Act of 1974, as amended, shall not be subject to the process of garnishment ... unless such garnishment is based upon a judgment for alimony or for child support[.]"

*Id.* at 828 n. 2, 108 S.Ct. 2182 (quoting Ga.Code Ann. § 18–4–22.1 (1982)). The Supreme Court held that ERISA pre-empted the Georgia statute, because the statute expressly referred to and specifically "single[d] out ERISA employee welfare benefit plans for different treatment under state garnishment procedures[.]" *Id.* at 830 & n. 4, 108 S.Ct. 2182. The Court distinguished the Georgia statute at issue from generally-applicable garnishment statutes, which apply equally to both ERISA and non-ERISA benefit plans, and which do not single out ERISA benefit plans for special treatment. Such generally-applicable statutes do not " 'relate to' an ERISA plan" and are not pre-empted by ERISA. *See id.* at 830 n. 4, 834, 108 S.Ct. 2182. The Court explained that "certain ERISA provisions, and several aspects of the statute's structure indicate that Congress did not intend to forbid the use of state-law mechanisms of executing judgments against ERISA welfare benefit

---

**66.** Docket # 745 at 2–3.

**67.** *Id.* at 3.

plans, even when those mechanisms prevent plan participants from receiving their benefits." *Id.* at 831–32, 108 S.Ct. 2182. The Court held that "Congress did not intend to preclude state-law attachment of ERISA welfare plan benefits." *Id.* at 838, 108 S.Ct. 2182 (footnote omitted).

Unlike the pre-empted Georgia statute in *Mackey*, the state statute at issue here, former N.Y. U.C.C. § 9–318(4), does not specifically refer to ERISA plans, or single out such plans for special treatment. Rather, under *Mackey*, it is the type of generally-applicable statute that is not pre-empted by ERISA.

### 3. New York trust law does not invalidate Comerica's security interest.

■■ Debtor argues that the Equitable Plan is a trust, so that Debtor's right to receive disability payments under the Plan is a beneficial interest in a trust. As such, Debtor says, his right to disability benefits is protected by the anti-alienation provisions of New York trust law. Debtor cites N.Y. Est. Powers & Trusts Law § 7–1.5 (McKinney 2002).[68] That New York statute limits the alienability of a beneficiary's right to receive income from an express trust. It states, in pertinent part, that:

(a) The interest of the beneficiary of any trust may be assigned or otherwise transferred, except that:

(1) The right of a beneficiary of an express trust to receive the income from property and apply it to the use of or pay it to any person may not be transferred by assignment or otherwise unless a power to transfer such right, or any part thereof, is conferred upon such

beneficiary by the instrument creating or declaring the trust.

N.Y. Est. Powers & Trusts Law § 7–1.5 (McKinney 2002).

This statute does not apply. The Debtor's right to disability benefits under the Equitable Plan is not a right to income from an express trust. This is because the Equitable Plan is not an express trust under New York law. As discussed in detail below, the Equitable Plan provides for the establishment of a separate trust, as a means of funding the Plan, and it appears that the Plan sponsor, The Equitable, did establish such a separate trust. But the Plan itself is not an express trust. As a result, the New York trust statute cited by Debtor does not apply to Debtor's right to disability benefits under the Plan, and does not invalidate Comerica's security interest in that right.

■■ Under New York law, an express trust is defined as " 'a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.' " *LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274 B.R. 600, 623 (Bankr.S.D.N.Y.2002), *aff'd*, 2004 WL 1948754 (S.D.N.Y.2004) (quoting Restatement (Second) of Trusts § 2 (1959)). An express trust requires four elements:

(I) a designated beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property sufficiently designated or identified to enable title thereto to pass to the trustee; and (iv)

---

68. Docket # 753 at 1–2. Debtor also cites Restatement (Third) of Trusts §§ 58 and 59, and a Michigan case, to the same effect as this New York statute. *Id.* at 3. But this opinion focuses on New York law, because that is the law that applies in this case. *See* discussion *supra* at n. 57. In any event, Debtor does not claim that Michigan trust law is substantively different than New York trust law on this issue.

the actual delivery of the fund or other property, or the legal assignment thereof to the trustee, with the intention of passing legal title thereto to him or her as trustee.

*Id.* at 623. The use of the term "trust" in a document does not require a conclusion that the document is a trust. It is the nature and substance of the parties' relationship that determines whether an express trust has been created. *Id.* at 616 n. 12.

The Court concludes that under New York law, the Plan itself is not, and did not create, an express trust, because it does not meet all of the requirements for an express trust.

Initially, the Court must note that several terms of the Plan show that The Equitable planned and intended to create a trust, as a means of funding the Plan. One part of the Plan even references "the Trust hereby created" and refers to the Plan as "this Trust." [69] The intent to create a trust is also evidenced by the Plan's use of trust terms, and the Plan's contemplation of a trust relationship between various parties. It is clear from the Plan who the intended beneficiaries of the Trust are to be. The Plan states that the Trust is for the benefit of eligible employees, such as the Debtor, and managers and agents, all of whom are referred to as the Plan's "Members." [70] And the Plan provides that, with certain limited exceptions, "all assets of the Trust Fund, including investment income, shall be retained for the exclusive benefit of the Members and their beneficiaries, and shall be used to pay benefits to such persons[,]" [71] and that "contributions made by the Employers may not under any circumstances revert to or inure to the benefit of the Employers; except ... upon an Employer's request, [where] a contribution ... was made by a mistake of fact[.]" [72]

The Plan anticipates the appointment of a "Trustee" who is a "fiduciary," and who shall "hold the Trust Fund" for the benefit of the "Member[s.]" [73] The Plan also contemplates that the Trustee will perform specific duties, which are detailed throughout the Plan. [74] The Plan provides that "[t]he Trustee shall have the sole responsibility for the administration of the Trust, and the management of the assets held under the Trust, except where an investment manager has been appointed, all as specifically provided in the Trust instrument." [75]

The Plan also designates, in general terms, the property that is to make up the *res* of the Trust. The Plan provides that the Trust property, called the "Trust (or Trust Fund)" includes "the ... amounts deferred or contributed on behalf of the

---

69. Plan (Ex. 5 of Docket 198) at Art. IX, ¶ 9.1–9.2 at 35–36.

70. *See, e.g.,* Plan at Art. I ("Foreward") at 1 ("The Equitable Life Assurance Society of the United States has established a Trust Fund"); Art. II, ¶ 2. 1(m) at 7 (defining who is a " 'Member' under the Plan"). The Plan indicates that it should be "viewed as three separate plans, a plan for the employees of The Equitable and its subsidiaries co-sponsoring the plan, a plan for the managers of The Equitable's insurance agencies, and a plan for its agents."

71. *Id.* at Art. V, ¶ 5.2 ("Trust Fund") at 23.

72. *Id.*

73. *Id.* at Art. II, ¶¶ 2. 1(k), (x).

74. *E.g, id.* at Art. V, ¶ 5.2 at 22 ("Trust Fund"); Art. VI (Administration) at 24, Art. VIII (Termination of the Plan) at 32.

75. *Id.* at Art. VI, ¶ 6. 1, entitled "Allocation of Responsibility Among Fiduciaries for Plan Trust and Administration," at 24–25. Paragraph 6.1 also delineates the duties of The Equitable and the Plan Administrator.

Members under the Plan, and from which benefit payments will be made." [76] The Plan also provides that "[The] Equitable and the Employers shall have no beneficial interest in the Trust Fund and no part of the Trust Fund shall ever revert to or be paid to ... [The] Equitable or the Employers." [77] Therefore, the funds of the Trust Fund are to be separate from the funds of the Employers and The Equitable. Finally, the Plan also shows an intent that the Trust to be created be a spendthrift trust, by including the Spendthrift Clause.[78]

The foregoing language in the Plan, including the Plan's reference to "the Trust hereby created," without more, could be interpreted to mean that the drafter intended the Plan itself to create the Trust. But elsewhere the Plan clearly shows an intention that a document separate and distinct from the Plan; namely, "the Trust instrument," would be the vehicle by which the Trust was created. In fact, the Plan defines the "Trust (or Trust Fund)" as "[t]he fund or funds established **pursuant to the Trust instrument** to receive and to invest the amount deferred or contributed on behalf of the Members under the Plan, and from which benefit payments will be made." [79] The Plan states that the "Trustee" will be "[t]he individual or corporation appointed by The Equitable **pursuant to the Trust instrument** to hold the Trust Fund." [80] Beginning with the "Foreward" and continuing throughout the entire Plan, the Plan treats the Plan, on the one hand, and the "Trust instrument" and the

"Trust," on the other hand, as separate and distinct things. For example, the "Foreward" of the Plan states that "[t]he Plan and **related trust** are intended to be a part of a voluntary employees' beneficiary association within the meaning of Section 501(c)(9) of the Internal Revenue Code of 1986, as the same may be amended from time to time." [81] There are also many references to "this Plan or the Trust instrument" and to "this Plan and the Trust instrument." [82]

Given these provisions, the Plan, when read in its entirety, unambiguously contemplates and requires the execution of a separate document—the "Trust instrument"—for the creation of the Trust. This conclusion is further supported by the fact that the Plan itself does not satisfy all of the requirements for an express trust under New York law. Although the Plan refers to the appointment of a Trustee who is either an individual or a corporation, the Plan does not actually name the Trustee. There is also no language in the Plan showing actual delivery or legal assignment of the Trust Fund to a named Trustee, with the intention of passing legal title. Under New York law, a designated trustee and such delivery of property are two requirements that must be satisfied to create an express trust.

For these reasons, the Plan itself is not a trust, and does not create a trust. A separate Trust instrument must exist for there to be a trust. And the parties appear now to agree that such a separate

---

76. *Id.* at Art. II, ¶ 2. 1(w) at 11; *see also id.* at Art. V, § 5.1 ("Contributions") at 22.

77. *Id.* at Art. IX, ¶ 9.3 at 18.

78. *See id.* at Article IX, ¶ 9.2 at 35.

79. *Id.* at Article II, ¶ 2. 1(w) at 11 (emphasis added).

80. *Id.* at Article II, ¶ 2. 1(x) at 11 (emphasis added).

81. *Id.* at Article I at 1 (emphasis added).

82. *See, e.g., id.* at Article VI, ¶ 6.1 at 24–25.

Trust instrument does exist.[83]

Thus, while there is a separate Trust instrument, which created a trust that was used by the Plan sponsor, The Equitable, as a vehicle to help fund the Plan, the Plan itself is not a trust. Because the Plan itself is not a trust, Debtor's right to disability payments *under the Plan* is not a beneficial interest in a trust. Therefore, New York trust law, and specifically, N.Y. Est. Powers & Trusts Law § 7–1.5, does not apply to *the Plan.*

■■■ Like the Equitable Plan, the Trust instrument contains a spendthrift provision. Three things about that provision are significant here. First, it applies only to any "interest in any payments under this Trust." Second, it explicitly draws a distinction between "the Trust Fund" and the employee benefit plans funded by the Trust Fund, such as the Equitable Plan. Third, it draws a distinction between a Plan Member's right to benefits provided under the employee benefit plans on the one hand, and any such Plan Member's "right, title or interest in or to the Trust Fund or any part thereof" on the other hand. It states that:

9.10 Except as otherwise provided by law, no **interest in any payments under this Trust** shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt so to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge shall be void. Neither shall the Trust Fund be in any manner liable for or subject to the debts, contracts, liabilities, engagements or torts of any person entitled to any payment or distribution in accordance with the provisions of the Plan. **No employee, Member, Dependent or any person claiming by, through or under any of them shall have any right, title or interest in or to the Trust Fund or any part thereof, except the right of a Member to benefits as provided under the respective Plan providing benefits to such Member or his Dependents.** No employee shall have the option to receive, instead of the benefits provided for by such Plan, any part of the contribution under this Trust Agreement.[84]

---

83. On October 9, 2009, the Court entered an Order entitled "Order for Limited Supplementation of the Record Regarding the Unresolved Portion of Debtor's Motion for Damages (Docket # 639)" (Docket # 761), which stated that "the Court cannot find a copy of any separate trust instrument or agreement in the record," and which provided, in relevant Part:

IT IS ORDERED that no later than October 23, 2009, the Debtor Tom D. Johnson and Comerica Bank each must file a supplement that either (1) attaches a copy of any trust instrument(s) or trust agreement(s) of the type referred to in this Order; or (2) states that he/it does not have any such document(s). In addition, if a party believes that any such document(s) is/are already in the record, he/it should state the docket number at which the item can be found.

Neither Debtor nor Comerica were able to produce a copy of the Trust instrument referred to in the Plan, in response to the Court's order, by the deadline. But later, on February 18 and 19, 2010, Comerica and the Debtor each filed a copy of the separate Trust instrument referred to by the Plan. (Docket ## 767, 769). Debtor stated in an affidavit that The Equitable provided him with a copy of this document in early February 2010 (*See* Aff. of Debtor with Trust attached) (Docket # 769 at Ex. 1; Docket # 767 at Ex. 1(c)) ("Declaration of Trust Establishing the Equitable Life Assurance Society of the United States, Employees, Managers and Agents Long Term Disability Benefit Trust (Effective as of January 1, 1988")) (the "Trust instrument"); Docket # 769 at Ex. 2.) The parties appear to agree that this is a copy of the Trust instrument referred to by the Plan, at least as of January 1, 1988.

84. Trust Instrument (Ex. 1(c) of Docket # 767) at 37 ¶ 9. 10 (emphasis added).

The Court will assume, for purposes of this opinion, that the spendthrift provision of *the Trust instrument* is enforceable under New York law. At most, that only means that Comerica could not enforce its security interest against the *Trust Fund*. It does not mean that Comerica cannot enforce its security interest against *the Plan*. As explained above, the Plan is a contract between The Equitable and the Plan participants, and is separate and distinct from the Trust. Debtor's right to disability payments is a contract right to payments in a certain amount if Debtor becomes disabled, and that right does not depend in any way on what assets are put into the Trust. The Plan is the document that gives Debtor the right to disability payments, not the Trust. Debtor's right to disability benefits would exist even if no trust or trust fund had been established. The Trust is simply the funding mechanism The Equitable has chosen to satisfy its obligations to the participants *under the Plan*. Therefore, whether Comerica can enforce its security interest against the Plan depends only on whether the Spendthrift Clause *in the Plan* is enforceable. And as discussed in Part III–A–2 of this opinion, that Spendthrift Clause is not enforceable because of former N.Y. U.C.C. § 9–318(4).

The Court's ruling, that the New York trust statute does not apply to the Equitable Plan, makes it unnecessary to resolve a conflict that would otherwise exist between that statute and the N.Y. U.C.C. statute, former N.Y. U.C.C. § 9–318(4). Such a conflict would exist if the New York trust statute did apply to the Equitable Plan. In that event, the New York trust statute, N.Y. Est. Powers & Trusts Law § 7–1.5(a)(1), would appear to make enforceable the Spendthrift Clause in the Plan. As quoted previously, that statute says that "[t]he right of a beneficiary of an express trust to receive the income from property

... may not be transferred by assignment or otherwise unless a power to transfer such right, or any part thereof, is conferred upon such beneficiary by the instrument creating or declaring the trust."

But as discussed in Part III–A–2 of this opinion, former N.Y. U.C.C. § 9–318(4)(now codified as N.Y. U.C.C. § 9–406(d)(1)) means that the Spendthrift Clause is ineffective and unenforceable as against Comerica's security interest. If the New York trust statute applied to Debtor's right to disability benefits under the Equitable Plan, the Court would have to resolve this conflict between two New York statutes. Because it is unnecessary to do so, the Court expresses no view on how it would resolve such a statutory conflict.

**B. By granting the security interest to Comerica, the Debtor waived his right to claim an exemption, as against Comerica, in his right to receive disability payments under the Plan.**

Although Comerica's security interest validly applies to Debtor's right to receive disability payments under the Plan, the Court still must determine whether Debtor's claim of exemption of these payments affects Comerica's security interest. The Court concludes that it does not. In granting Comerica a security interest in these payments, Debtor waived his right to an exemption as against Comerica, to the extent of Comerica's security interest.

Bankruptcy Judge Graves determined that Debtor's disability payments under the Plan are exempt under Mich. Comp. Laws Ann. § 600.6023(1)(f), and on appeal the district court observed that the disability payments "would facially appear to fall

within the scope of" this statute.[85] But Judge Graves never determined the waiver issue remanded by the district court namely, whether Debtor waived his right to claim an exemption, as against Comerica, in his right to receive disability payments under Michigan law.[86]

■ Mich. Comp. Laws Ann. § 600.6023(1)(f) provides:

(1) The following property of the debtor and the debtor's dependents shall be exempt from levy and sale under any execution:

. . .

(f) Any money or other benefits paid, provided, or allowed to be paid, provided, or allowed, by any stock or mutual life or health or casualty insurance company, on account of the disability due to injury or sickness of any insured person, whether the debt or liability of such insured person or beneficiary was incurred before or after the accrual of benefits under the insurance policy or contract, except that the exemption does not apply to actions to recover for necessities contracted for after the accrual of the benefits.[87]

Mich. Comp. Laws Ann. § 600.6023(2) limits the exemptions under Mich. Comp. Laws Ann. § 600.6023. It states: "The exemptions provided in this section shall not extend to any lien thereon excluded from exemption by law."[88]

■ Under Michigan common law, a debtor may not exempt property against a valid consensual lien. The voluntary granting of a security interest in exempt property has been construed as a waiver of the right to claim an exemption in the property, as against the security interest. Under longstanding Michigan law, a debtor can freely waive his right to an exemp-

---

85. *See* Docket # 407 (May 30, 1997 Order of District Judge Cook) at 7.

86. *See* discussion *supra* Part II–C of this opinion.

87. It would appear that for Mich. Comp. Laws Ann. § 600.6023(1)(f) to apply, the Plan would need to be deemed a "company" of one of the types listed in the statute—*i.e.* a stock company; a mutual life insurance company, a health insurance company; or a casualty insurance company. While The Equitable may be a "company" of the type described by the Michigan exemption statute, arguably the Plan is not. Under ERISA, the Plan is a separate legal entity from its sponsor, The Equitable. *See Hill v. Aetna Life Ins. Co.*, 546 F.Supp.2d 343, 348 (S.D.Miss.2008) ("ERISA explicitly recognizes employment benefit plans as separate legal entities capable of suing and being sued.") (citing 29 U.S.C. § 1132(d)(1)). However, Judge Graves did not note or discuss this distinction. Furthermore, while Judge Graves's exemption ruling arguably may imply that the Plan is an insurance policy, Judge Graves never explicitly made such a determination. (*See* Memorandum Opinion (Docket # 271) at 18–19, 22; Amended Memorandum Opinion (Docket # 421) at 17–18, 21.) There is no analysis of this exemption provision and no reasoning in either of Judge Graves's opinions as to why § 600.6023(1)(f) applies. In any event, whether or not the Plan can be deemed an insurance policy within the meaning of Mich. Comp. Laws Ann. § 600.6023(1)(f), the Court now concludes that the Plan cannot be deemed an insurance policy for purposes of New York's Uniform Commercial Code. *See* discussion in Part III–A–2–b of this opinion.

88. Effective in 2005, Michigan adopted a new exemption statute that is applicable only in bankruptcy cases, Mich. Comp. Laws Ann. § 600.5451. While this case predates the new statute, the Court notes that § 600.5451(2) now explicitly states that exemptions do not apply to a security interest:

(2) An exemption under this section does not apply to a mortgage, lien, or **security interest in the exempt property that is consensually given** or lawfully obtained unless the lien is obtained by judgment, attachment, levy, or similar legal process in connection with a court action or proceeding against the debtor.
(Emphasis added).

tion, and grant a security interest in exempt property. *See In re National Grocer Co.*, 181 F. 33, 35 (6th Cir.1910) (holding that "[t]he mortgaging or conveying of exempt property to a creditor is not against the public policy of the state of Michigan[,]" and that "that the bankrupt had the power to convey to [a creditor] his existing exemptions" resulting in the exempt property not being property of the debtor or the debtor's bankruptcy estate); *Church v. First Nat. Bank*, 255 Mich. 595, 238 N.W. 192, 194 (1931) (stating that "[b]eyond question, one entitled to an exemption in property may, if he sees fit, waive such right in the event of a levy and execution sale" and also that "[i]f the right of exemption can be waived, it follows that its assertion may be prevented by such laches as work[s] an estoppel").

 Under 11 U.S.C. § 522(c)(2), a valid lien on property claimed as exempt, that is not avoided during the bankruptcy case, survives the debtor's discharge and can be enforced against the property claimed as exempt. Section 522(c)(2) provides:

> (c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502 of this title as if such debt had arisen, before the commencement of the case, except—
>
> . . .
>
> (2) a debt secured by a lien that is—
>
> (A)(I) not avoided under subsection (f) or (g) of this section or under

section 544, 545, 547, 548, 549, or 724(a) of this title; and

> (ii) not void under section 506(d) of this title[.]

Michigan case law recognizes this principle as well. In *Kleinheksel v. Delta Properties, Inc.*, No. 254114, 2005 WL 1683555, at *3–4 (Mich.Ct.App. July 19, 2005) (per curiam) (unpublished) (citations omitted),[89] the Michigan Court of Appeals explained:

> A party in interest may file an objection to the list of property claimed as exempt. FRBP 4003(b). However, as suggested by § 522(c)(2), a secured creditor need not object to a debtor's claimed exemption in order to preserve its lien. A bankruptcy discharge does not prevent enforcement of valid liens regardless of whether property is deemed exempt or nonexempt.
>
> While the general rule is that exempt property will not be liable for unsecured claims during or after the case, the rule is reversed with respect to secured claims. Thus, exempt property remains liable for all liens not avoidable under the avoiding powers contained in the Bankruptcy Code. Similarly, a bankruptcy discharge will not prevent the enforcement of valid liens as against exempt property.

 Federal bankruptcy cases likewise hold that a debtor's right to an exemption "is available to the debtor only to the extent that he holds an interest in the property that is not subject to unavoidable liens." *First of America Bank v. Gaylor (In re Gaylor )*, 123 B.R. 236, 239 (Bankr.

---

**89.** Although in Michigan "[a]n unpublished opinion is not precedentially binding under the rule of stare decisis[,]" *see* Mich.Ct.R. 7.215(C)(1), such an opinion can be cited as persuasive authority. *See Nuculovic v. Hill,* 287 Mich.App. 58, 783 N.W.2d 124, 131 (2010) (Borello, J., concurring in part and dissenting in part); *see also Slater v. Ann Arbor Public Schools Bd. of Educ.,* 250 Mich. App. 419, 648 N.W.2d 205, 214 (2002) (citing and discussing an unpublished opinion because its reasoning was persuasive). The Court finds the *Kleinheksel* case to be a persuasive indicator of how the Michigan Supreme Court would rule on the issue.

E.D.Mich.1991); *see also Day v. Boteler* (*In re Boteler*), 5 B.R. 408, 411 (Bankr. S.D.Ala.1980); *Chandler Bank of Lyons v. Ray*, 804 F.2d 577, 579 (10th Cir.1986) (holding that the discharge injunction under 11 U.S.C. § 524 does not preclude a creditor with a valid lien from enforcing its security interest against exempt as well as non-exempt property).

■ Because Debtor voluntarily granted Comerica a security interest in his right to receive disability payments, Debtor waived any right to claim his disability payment as exempt, as against Comerica's security interest. And because Comerica's security interest was not avoided during the debtor's bankruptcy, it survived Debtor's discharge. Therefore, Comerica's security interest in Debtor's right to receive disability payments is enforceable.

## IV. Conclusion

Comerica's security interest applies to Debtor's right to receive disability benefits under the Equitable Plan. That security interest is not rendered unenforceable by the Spendthrift Clause in the Plan, because that clause is itself made ineffective by former N.Y. U.C.C. § 9–318(4). Nor is Comerica's security interest invalidated by New York trust law, as Debtor argues. And Comerica's security interest survived Debtor's bankruptcy discharge. It follows that Comerica's alleged attempt to enforce that security interest did not violate the discharge injunction. Thus, Debtor's Mo-

tion must be denied. The Court will prepare and enter a separate order.[90]

---

**90.** The Court notes that the Equitable Plan and its plan administrator are not parties to this litigation. As a result, they might argue that they are not bound by this opinion and the resulting order, if Comerica should seek to enforce its security interest against the Plan in the future. This Court expresses no view on that subject, however, because it is not necessary to do so in order to decide Debtor's Motion in this case. In addition, in hearings on Debtor's Motion in this case, Comerica's counsel repeatedly stated that Comerica no longer seeks to enforce its security interest in Debtor's right to disability benefits under the Equitable Plan.